FARINA BROTHERS CO., INC. *vs.* COMMONWEALTH.

Suffolk.   October 9, 1969. — April 2, 1970.

Present: WILKINS, C.J., CUTTER, KIRK, SPIEGEL, & REARDON, JJ.

*Contract,* Building contract, Performance and breach, Modification.

A contractor with the Commonwealth for a complex project of eliminating railroad grade crossings in the business section of a city was entitled to recover from the Commonwealth for damage resulting from delay, due to its fault, in making buildings in the path of the contractor's work available for demolition and in relocating railroad tracks where it appeared that in the face of such delay the Commonwealth's representatives unreasonably, arbitrarily and capriciously refused a request by the contractor to stop the contractor's work temporarily or to reschedule it; in the circumstances, the Commonwealth did not have a defence under provisions of the parties' contract to the effect that the contractor should have no claim for expense due to delay but only an extension of time for performance.  [138–139]

On the facts, a conclusion was warranted that a contractor with the Commonwealth on a project of eliminating grade crossings, after giving notices to the Commonwealth of a claim for damage incurred by the contractor over a period of months through delay brought about by fault of the Commonwealth, seasonably complied with a provision of the parties' contract requiring the contractor to furnish the Commonwealth's engineer "an itemized statement of the details and amount of such . . . damage."  [139–140]

Where it appeared that a construction contract with the Commonwealth originally contemplated a temporary removal of overhead electric power lines, which would have permitted raising on end long steel beams preparatory to driving them vertically into the ground by the contractor, but that, upon refusal of the electric company to remove the wires, a procedure was agreed upon whereby each beam was cut into short sections by the contractor and, as a section was raised on end and driven into the ground, another section was spliced to it and the whole was driven into the ground, and so forth, which caused additional labor and equipment to be employed, it was held that the contractor was entitled to recover from the Commonwealth for such extra work.  [142–143]

A construction contract with the Commonwealth gave its engineer authority to issue certain change orders as to the location and quantity of steel piles to be left in place permanently.  [143]

Where the parties to a construction contract with the Commonwealth agreed that, because of a shortage of steel due to a strike, the Common-

wealth would furnish the contractor with certain required steel from the Commonwealth's own supply at the actual price paid by it for such steel some years before, its representatives wrongfully charged the contractor for the steel at a higher price current at the time the steel was delivered to the contractor. [144–145]

PETITION filed in the Superior Court on November 10, 1960.

Following the report of an auditor, a motion to strike certain portions of the report was denied by *Sullivan*, J. The case was heard on the merits by *Brogna*, J.

*John E. Sheehy*, Assistant Attorney General (*Peter R. Leone*, Assistant Attorney General, with him), for the Commonwealth.

*Francis V. Matera* for the petitioner.

REARDON, J. Farina Brothers Co., Inc. sought damages in a petition brought under G. L. c. 258 for an alleged breach of a contract which it had with the Commonwealth. The petition, as amended, advanced six claims. The case was referred to, and heard by, an auditor with findings of fact not final. Thereafter the case was heard before a judge of the Superior Court who made findings and rulings in favor of the petitioner. A motion by the Commonwealth to strike portions of the auditor's report was denied. A total finding of $512,471.91 was made in favor of the petitioner. The Commonwealth comes here on an outline bill of exceptions based upon its claim of exceptions to the court's findings and rulings and to the denial of its motion to strike portions of the auditor's report.

The Commonwealth acting through its Department of Public Works (Department) awarded to Farina Brothers Co., Inc. (contractor) on September 6, 1955, a contract in the sum of approximately $5,250,000 for the elimination of railroad grade crossings by construction of a tunnel and the relocation of railroad tracks in the center of the main business section of the city of Salem. The contract documents (all prepared by the Department) included the Standard Specifications for Highways and Bridges, 1953 edition (Blue Book), plans relating to the grade crossing elimination and

special provisions. The work was to be completed within 720 days from September 6, 1955. This termination date was extended six times, the actual completion date being November 20, 1959.

The contract required performance without interruption of railroad traffic, the demolition of buildings, the removal of a stone arch tunnel, the construction of a box tunnel structure, the relocations of the sewer and water systems, and construction of a station platform, a pedestrian overpass, retaining walls, and certain other items of a complex and difficult nature. Payment was to be made to the contractor in accordance with the provisions of the contract dealing with various items of work at unit prices. The project area was divided into four zones.

The petition stated six claims.

Claim A was based upon (1) the alleged delay on the part of the Commonwealth in the release of the buildings for demolition, (2) the delay in the relocation of the railroad tracks, allegedly the fault of the Commonwealth, and (3) the liability of the Commonwealth stemming from the engineer's refusal to "close down the job" or reschedule the work.

Claim B related to a subsoil condition not foreseen by the engineer in which it was necessary to engage in unforeseen excavation and to install a crushed stone and pipe subdrain.

Claim C related to the alleged failure of the Commonwealth to cause certain high tension lines over the construction site to be relocated, with consequent additional expense to the contractor in its work.

Claim D was based on extra cost for substituting steel "H" piles instead of wooden piles in Zone B of the construction.

Claim E was for the fair value of the steel left in place at Zone B consequent upon the change from wooden to steel piles. This claim was alternative to Claim D.

Claim F was based on a charge to the contractor for a loan of 572 tons of steel from the Department. The alleged understanding was that any steel not incorporated in

the work by the contractor would be returned to the Department and that the steel not returned would be substituted by payment for the actual cost of the steel not returned. The contractor claims the Department has taken an excessive credit out of the payment due to it.

The disposition of these claims by the auditor and the trial judge was as follows:

| Claim | Auditor's Finding | Court's Finding |
|-------|-------------------|-----------------|
| A | $276,233.53 (plus interest) | $276,233.53 110,877.38 interest |
| B | For respondent | For respondent |
| C | $ 21,030.57 | $ 37,281.90 14,964.58 interest |
| D | $ 35,972.60 (plus interest) | $ 35,972.60 14,439.04 interest |
| E | $ 31,575.85 (plus interest) | For respondent |
| F | $ 16,200.62 (plus interest) | $ 16,200.62 6,502.62 interest |

The contractor seeks entry of judgment in accordance with the findings of the trial judge on claims A, C, D and F, with interest from November 10, 1957. We shall deal with these claims seriatim.

Claim A. Before the work commenced the contractor studied the project and proposed a work schedule covering twenty-seven categories of construction operations which was approved approximately on the day of the award of the contract as the result of conversation with the commissioner of the Department. Subsequently, on September 9, 1955, the contractor submitted an "operational procedure of its work to the Chief Engineer who approved it." A subsequent bar graph work progress schedule was approved by the engineer late in November of 1955. The work commenced in mid-October of 1955 when the contractor began underpinning buildings. Difficulty arose within several months when the contractor was slowed up in its work by the failure

of the Department to make land takings and release certain buildings in the path of construction for demolition.   Excavation for the tunnel construction commenced but was brought to a halt by the failure of the railroad to remove its tracks.

As the delays occurred the contractor engaged in a series of fruitless conferences wherein it was shuttled between the resident engineer, district highway engineer, and the right-of-way division of the Department.   It requested permission of the resident engineer and the chief engineer "to shut down the job until the railroad work was completed and the buildings [were] released for demolition," which permission was refused.   "[T]he contractor was ordered to continue to work wherever and however it could be done under threat that if . . . [it] shut the job down, the Chief Engineer would default the contractor and bring in . . . [its] bonding company."   The relocation of the railroad tracks which was to be completed by March 22, 1956, was not actually completed until August 6, 1956.   These delays produced the claims which the contractor has made in which it states that it had deployed its labor, equipment and materials, and upon which the judge and the auditor found that the "unreasonable, arbitrary, and capricious acts of the Commonwealth in refusing to grant extensions of time or to reschedule the work to be performed" gave rise to a cause of action.   Without further elaborating upon the facts relative to these claims it suffices to say that the conduct of the Department and its representatives in dealing with this contractor as disclosed by the record does not commend itself to the court.   We must determine the liabilities on the contracts which governed the parties.

The gravamen of the contractor's claim is that the delay in track removal and the building demolition entitled it to an order by the engineer which would permit it to stop work or to modify its progress or to extend the time for the completion of its work.   It is further claimed that the engineer's refusal, under threats of default and notification to the contractor's bonding company, to permit the contractor to

stop its work was unreasonable, arbitrary and capricious conduct which would entitle the contractor to recover damages under art. 58 of the Blue Book.[1] Underlying any discussion of the contractor's delay claim necessitates reference to the contract provisions which are of importance. The Commonwealth has made reference in its brief to a number of these and we refer to them in the margin.[2]

In addition to the Blue Book provisions there were other provisions in the uniform special provisions of the contract, red flags to alert the contractor to delay possibilities.[3]

---

[1] "All claims of the Contractor for compensation other than as provided for in the contract on account of any act of omission or commission by the Party of the First Part or its agents must be made in writing to the Engineer within one week after the beginning of any work or the sustaining of any damage on account of such act, such written statement to contain a description of the nature of the work performed or damage sustained; and the Contractor shall, on or before the fifteenth (15th) day of the month succeeding that in which such work is performed or damage sustained, file with the Engineer an itemized statement of the details and amount of such work or damage."

[2] "Article 68. Delay in Commencing Work. The Party of the First Part may delay the commencement of the work, or any part thereof, if the Party of the First Part shall deem it best for its interests to do so. The Contractor shall have no claim for damages on account of such delay, but shall be entitled to an equivalent extension of time in which to complete the whole or any portion of the work required under the contract. The Contractor shall have no claim for damages on account of any delay on the part of the Party of the First Part in performing or furnishing any work or materials to be performed or furnished by the said Party of the First Part in connection with the execution of the work covered by the contract."

"Article 69. Moving Buildings and Land Takings. Removal of buildings within the highway location will be done under other and separate contracts and the provisions of Article 33 shall apply. The Party of the First Part shall not be held liable for any expense to the Contractor on account of any delay or interference with his work due to moving the buildings or on account of any failure to remove any buildings or because of the necessary land takings."

"Article 74. Determination and Extension of Contract Time for Completion. . . . A. In case the commencing of work is delayed by the Party of the First Part an extension of time will be allowed as stated in Article 68, Delay in Commencing Work. . . .

"D. When delay occurs due to reasonable causes beyond the control and without the fault or negligence of the Contractor, including but not restricted to acts of God, acts of the public enemy, acts of the Government, acts of the State or any political subdivisions thereof, acts of other contracting parties over whose acts the Contractor has no control, fires, floods, epidemics, strikes except those caused by improper acts or omissions of the Contractor, extraordinary delays in delivery of materials caused by strikes, lockouts, wrecks, freight embargoes, or acts of God, the time for completion of work shall be extended in whatever amount is determined to be equitable. . . ."

[3] "General–6: Uniform Special Provisions. 'Delay in Demolition Operations. In case the structures to be demolished under this contract or any of them are not available for demolition operations at the time of award of this

We thus assess the contractor's claim in the light of provisions to which it subscribed and in the posture of the contract as we find it. In *Wes-Julian Constr. Corp.* v. *Commonwealth,* 351 Mass. 588, in which recovery was denied to the contractor, the Blue Book provisions, also part of the contract, warned the contractor of the possibility of delay, and both in that case and in this the Commonwealth was given power to delay the work "if . . . [it] shall deem it best for its interests to do so," in which event the contractor "shall have no claim for damages on account of such delay, but shall be entitled to an equivalent extension of time in which to complete . . . the work." *Wes-Julian Constr. Corp.* v. *Commonwealth, supra,* at page 594. In this and the *Wes-Julian* case a railroad was to relocate existing tracks without expense to the contractors. In this case special provision General–4 provided that any failure of the railroad to complete its work by a particular date would not result in additional financial compensation for the contractor but the contractor would be granted an extension of time for the amount of such delay. Similar provisions prevailed relative to the removal of buildings.

The Commonwealth in its defence against the contractor on Claim A takes refuge in the contract provisions which have been noted and in strong reliance upon what we had to say in the *Wes-Julian* case relative to contractors' rights where delay occurs. However, there are certain distinctions present here which lead us to a different result. This con-

contract and the Contractor is so delayed thereby that he cannot complete the work within the contract time, he will be granted an extension of time in accordance with the provisions of Article 68.' ''

"General–4: Uniform Special Provisions. 'Relocation and Removal of Tracks by Railroad. Work of constructing and relocating tracks for temporary outbound and inbound mainline tracks and temporary yard facilities will be started about 30 days after award of the contract. It is expected but not guaranteed that completion of track and other work will require about 120 working days.

'In case, however, the Contractor is, in the opinion of the Engineer, delayed in any part of the work because of the failure of the Railroad to complete the aforesaid work by said date so that he is unable to complete the work to be done under this contract by the time hereinafter stipulated therefor, he will be granted an extension of time by the amount of such delay, as determined by the Engineer, but no extra compensation will be granted the Contractor on account of such delay.' ''

tract involved, as the auditor found, a highly complex undertaking requiring a high degree of coördination between all parties. The contractor deployed its personnel, equipment and material to meet the requirements of the contract in this regard. In fact, the auditor found "[t]he contractor was buffeted from the Engineer to the District Highway Engineer to the Chief Engineer . . . in his efforts to obtain the co-ordinated assistance of the Department in the performance of its (the Department's) obligations under the contract" and "[t]he contractor was repelled and insulted by the Chief Construction Engineer who blatantly informed him he didn't care about what was happening and would do nothing to carry out the obligations of the Department."

These subsidiary findings led the auditor to the conclusion that damage was caused to the contractor in that it was "unreasonably hampered in its work and unreasonably delayed by the failure of the Department Engineer to reasonably exercise his efforts to meet the obligations of the Department." He also found the "Engineer was arbitrary and capricious by his refusal to permit the contractor to . . . [e]xtend the time of completion of the work when requested by the contractor in September, 1955" or to shut down the work in February, 1956, when it was prevented from going forward with excavation of the tunnel structure by the failure of the railroad to relocate tracks or reschedule it when such a move became necessary to conform to changed conditions. The entire record discloses a cavalier treatment of the contractor by the Commonwealth which seems to have rested secure during the period in question on the contract provisions relative to delay and extension.

These are not the facts of the *Wes-Julian* case where it was not shown that, if delays occurred, the contractor was not promptly granted extensions to which his contract entitled him. In circumstances such as here appear, however, the Commonwealth in effect has used the delay provisions to whipsaw the contractor. So employed, they cannot absolve the Commonwealth of liability. If, as may be the case, delay is to occur during performance of the contract

the collateral provisions relating to appropriate extensions should come promptly into play. In the present instance their application was unconscionably delayed in a manner to deprive the contractor of such protections as the Blue Book afforded to it. Adherence to these standards by both parties is required. The evidence supports the conclusion that agents of the Commonwealth by intentionally obstructing the application of those standards caused damage to the contractor. The trial judge correctly concluded "that the refusal of the Commonwealth to grant an extension of time or to reschedule the work when the railroad did not relocate its tracks within the time contemplated is a breach by the Commonwealth of the contract terms entitling the . . . [contractor] to damages."

We perceive nothing in *Marsch v. Southern New England R.R.* 230 Mass. 483, 495–496, which is to the contrary. The damage here did not arise from the Commonwealth's exercise of the privilege of delay or changing the time of performance but from the complete failure of its agents promptly to afford to the contractor the protection of extensions and the opportunity to reschedule its work during performance.[4]

The Commonwealth contends that the contractor did not perfect its itemized claim within the time specified either under art. 23 of the Blue Book covering extra work or art. 58 relating to the contractor's claims for compensation "other than as provided in the contract on account of any act of omission or commission" by the Commonwealth. The itemized statement of the delay claim was filed on October 2, 1956. This was preceded by a letter from the contractor of September 26, 1956, which put the engineer on notice that such a claim was in process of preparation. Other notices of similar tenor had preceded that of September 26. The exhibits indicate that the contractor prepared and submitted

---

[4] In disposing of this case we do not deem it necessary to treat with the contentions of the contractor that the work progress schedule submitted by it become part of the contract. Compare *State Line Contractors, Inc.* v. *Commonwealth,* 356 Mass. 306. See *Morse* v. *Boston,* 253 Mass. 247, 253; *Benjamin Foster Co.* v. *Commonwealth,* 318 Mass. 190.

its claim at the earliest time practicable, having warned that it was preparing to do so. The nature of the injury to it, occurring as it did over a period of months, made it unlikely that it could engage upon a summary of damages any earlier than it did. The judge's ruling on this question recognized that circumstance and we find no fault with it. See *M. DeMatteo Constr. Co.* v. *Commonwealth,* 338 Mass. 568, 582.

In sum, we hold that the Commonwealth cannot hide behind the specifications of its contract dealing with delay and, in the circumstances of this case, deny recovery to a contractor who has been put upon to the extent here shown. We have dealt not with the question of damages caused by delay itself which was the main subject of the *Wes-Julian* case. We have dealt rather with damages caused the contractor by failure to grant seasonable extensions for performance made necessary by delay and failure of the Commonwealth to assist the contractor properly in rescheduling work. It remains only to say that the Commonwealth cannot expect unfailing and honest performance by contractors when it administers its contracts as this one appears to have been administered.

Claim C. The contractor made a claim on the basis of provisions in the contract to the effect that "temporary maintenance, support and permanent restoration of existing electric power, lighting . . . affected by the work to be done under this contract" were to be done by other parties. The terms of the contract relative to the excavation of the tunnel structure called for the contractor to drive steel "H" beams, known as soldier beams, vertically into the ground for a depth of forty to sixty feet which, together with connecting wooden boards, were to form a solid wall. The insertion of these beams, which were between forty to sixty feet in length, required that they first be raised on end by a power crane suspended seventy-five to ninety feet in the air above the excavation, following which they would be driven into place by a steam driven hammer. However, in the area in which these beams were to be driven high tension

electric power lines in three banks from forty-six and nine-tenths feet to fifty-four feet above the ground were overhead for a distance of some 200 feet along the excavation line. This served to prevent the driving of the soldier beams to their full length.

Prior to arriving at the work area under the power lines, the contractor requested the Department to maintain and support the power lines so as to enable it to proceed with its work of driving the "H" beams. On November 1, 1956, the contractor notified the New England Power Company in writing to relocate the troublesome power lines temporarily. This notification was followed by discussion between the contractor, officers of the New England Power Company and the Department's engineer. The power company refused to disconnect its power lines and, after various consultations, the engineer ordered the contractor to proceed with the driving of the beams in short lengths, splicing them in the area under the power lines. On March 15, 1957, the contractor, at the request of the engineer, submitted an offer to do the required extra work for $124,700. The Department several weeks later disclaimed any obligation to pay for the extra work. After more discussion, on May 31, 1957, the engineer in writing approved the procedure of driving the "H" beams in short sections, splicing where necessary to reach the required excavation depth. The contractor so performed its work, and the auditor found that the contractor was required to cut the longer "H" piles to fifteen foot lengths which were then raised to a height of not more than thirteen feet below the power lines. "As each fifteen (15') foot pile was driven into the ground, another fifteen (15') foot H pile was spliced to it and the spliced pile was then driven into the ground. . . ." This method produced one to three steel pile cuts of fifteen foot lengths and one to two splices for each soldier beam location five feet on center for two hundred feet, or a total of eighty pile locations. As a result, additional equipment in the nature of welding machines, additional labor (welders and helpers), and an additional crane were employed.

· The auditor found that the Department approved the
method adopted by the contractor in its work progress
schedule and shop drawings which showed "H" piles to ·be
driven in long lengths without "the electric power trans-
mission line impediment." He also found a "changed con-
dition was caused by the order of the Engineer directing the
contractor to drive piles in short sections under the electric
power transmission lines." For this change the auditor
found the contractor entitled to additional compensation,
inclusive of direct labor equipment and material costs, less
certain credits and with certain other additional costs, in
the sum of $37,281.90, with interest at five per cent be-
ginning sixty-six days after November 20, 1959. This work
was extra work under art. 23 of the standard specifications
for which the contractor should be paid.[5] The auditor was
warranted in concluding that the additional charges were
necessitated by the alteration in the contract due to the
failure to remove the power lines. This conclusion merely

---

[5] "Article 23. Extra Work. The Contractor shall do any work not herein
otherwise provided for when and as ordered in writing by the Engineer, such
written order to contain particular reference to this article.

"If the Engineer directs, the Contractor shall submit promptly in writing
to the Engineer an offer to do the required extra work on a lump sum or unit
price basis, as specified by the Engineer. The stated price shall be divided so
as to show that it is the sum of; (1) the estimated cost of direct labor, materials,
and use of equipment, plus 10 per cent of this total for overhead; (2) plus
the estimated cost of Workmen's Compensation and Liability Insurances,
Social Security deductions, and Unemployment Compensation benefits; (3)
plus 6 per cent of the total of (1) and (2) for profit; (4) plus the estimated
proportionate cost of surety bond.

"If the Contractor claims compensation for extra work not ordered as afore-
said, or for any damage sustained, he shall, within one week after the begin-
ning of such work or of the sustaining of any such damage, make a written
statement to the Engineer of the nature of the work performed or damage sus-
tained, and shall on or before the fifteenth day of the month succeeding that
in which any such extra work shall have been done or any such damage shall
have been sustained, file with the Engineer an itemized statement of the
details and amount of such work or damage; and unless such statement shall
be made as so required, his claim for compensation shall be forfeited and
invalid, and he shall not be entitled to payment on account of any such work
or damage.

"Such notice by the Contractor and the keeping of costs by the Engineer
shall not in any way be construed as proving the validity of the claim.

"Unless specifically noted in the extra work order, extra work will not ex-
tend the time of completion of the contract as stipulated in Article 74, part E.

"Payment for extra work will be made in accordance with the provisions of
Article 80."

applies the "natural meaning of the language" in arts. 22 and 23 of the standard specifications. *Chas. T. Main, Inc.* v. *Massachusetts Turnpike Authy.* 347 Mass. 154, 163.

Claim D. Under the terms of the original contract the contractor was to utilize steel soldier beams in Zones B and C of construction and then remove them for a further use in Zone A where they were to be left permanently. During the progress of the work in Zone B the engineer issued a change order requiring the steel "H" beams to be left in place in Zone B. The contract contained no provision for the payment of steel left in place in Zone B. However, the engineer's written order that this be done was followed by an agreement that the contractor would be paid eleven cents a pound for steel left in place and that wooden piles would be substituted for steel piles in Zone A. The contention of the contractor, and a proper one, is that the engineer had the authority to enter into such a modification under art. 28 of the standard specifications as well as under arts. 22 and 23.⁶ The contractor proceeded to drive wooden piles in Zone A in accordance with the contract alteration. The engineer became concerned about the ensuing stability

---

⁶ "Article 22. Alteration of work. Should it be found desirable in the form or character of any of the work done, or to be done, the Engineer may order such alterations to be made, defining them in writing, supplemented with drawings when in the opinion of the Engineer it is necessary, and the alterations shall be made accordingly; provided that in case such alterations increase the cost of the work the Contractor shall be remunerated at prices based on prices allowed on the same character of work under the specifications, and in case the alterations shall diminish the cost of the work no allowance will be made for anticipated profits.

"In case of any alterations, so much of the contract as is not necessarily affected by such alterations shall remain in force upon the parties thereto, and such alterations shall be made under the terms of and as a part of the contract, and the security for the performance of the contract shall in nowise be invalidated, but shall be held to secure in like manner the performance of the alterations made under the contract and of any extra work done under the provisions of Article 23."

"Article 28. Authority of the Engineer. The Engineer shall decide all questions which may arise as to the quantity, quality, acceptability, fitness and rate of progress of the several kinds of work to be performed and materials to be furnished under the contract, and shall decide all questions which may arise as to the interpretation of any part of the contract, especially the plans and specifications which are a part thereof, as to the fulfillment of this contract on the part of the Contractor, and the determination and decision of the Engineer shall be final and conclusive; and such determination and decision, in case any question shall arise, shall be a condition precedent to the right of the Contractor to receive any money hereunder."

of the old stone arch tunnel. The contractor was then ordered to drive steel "H" piles in that zone by a letter from the Commissioner of Public Works under date of July 1, 1957. This letter was in effect confirmed by a second letter from the engineer on July 26, 1957. A fair price of the steel at the time of this second modification was sixteen cents a pound. The auditor found that the work of driving ten wooden beams and 180 steel "H" piles resulting from these changes was not "contemplated or otherwise provided for under the terms of the contract." With appropriate adjustments the auditor made a finding on this item for $35,972.60, with interest at five per cent beginning sixty-six days from November 20, 1959. This finding was adopted and confirmed by the trial judge.

Claim F. The contract modification discussed in treating claim D resulted in steel "H" piles being permanently left in place in zones A and B. The original contract requirement was that steel was to be left only in Zone A; hence, the use of more steel was necessitated. A labor steel strike caused a shortage of steel and, that the contract might go forward, the engineer proposed, and the contractor agreed, that the Department lend steel from its own inventory to the contractor. It was contemplated that on completion of the work either this steel would be replaced in kind or reimbursement would be made for unreturned steel at its cost when purchased by the Department in 1951.

On this basis the contractor received from the Department about 572 tons of steel and returned about 222 tons, leaving 350 tons to be credited to the Department, employing the 1951 purchase price. On March 8, 1960, the Department's Board of Commissioners voted to withhold an amount for the unreturned steel based upon actual Department cost in 1951. However, thereafter on June 28, 1960, "and as a result of a review of the steel loan transaction by the office of the State Auditor, the Department's Board of Commissioners voted '. . . to rescind said vote . . . and to withhold the amount of $53,607.06 . . .' for the unreturned steel based upon the current price of the steel when delivered to

the contractor during November and December, 1958."
The auditor further noted that the negotiated price for the
steel between the engineer and the contractor was only a
part of an agreement predicated upon other contract modifi-
cations.  The auditor found that when the contractor en-
tered upon the work steel was fully available to carry out
the work in accordance with the work progress schedule and
that changed conditions arose from the engineer's order
directing the steel to be left in place in Zone B.  He further
found that the subsequent action of the commissioners
rescinding their vote "so as to avoid an unfavorable report
of the [State] auditor . . . is not binding upon the con-
tractor who completed all of the work in reliance upon their
agreement."  On this claim the auditor concluded, and the
judge confirmed, that the Department had wrongfully
withheld a credit of $53,607.06, that it was entitled to with-
hold only $37,406.80, and that the Department owes the
contractor $16,200.62, with interest at the rate of five per
cent beginning sixty-six days after November 20, 1959.

There is no error in the denial of the respondent's sub-
stitute motion to strike.

It follows that judgment will be entered for the contractor
on claim A in the sum of $276,233.53, on claim C in the
sum of $37,281.90, on claim D in the sum of $35,972.60,
and on claim F in the sum of $16,200.62, together with
interest on the total awards computed at six per cent from
November 10, 1960.  *State Line Contractors, Inc.* v. *Com-
monwealth*, 356 Mass. 306, 323.

*So ordered.*