JOSEPH E. BENNETT CO., INC. *vs.* COMMONWEALTH.

Suffolk.  September 12, 1985. — December 27, 1985.

Present: PERRETTA, KASS, & WARNER, JJ.

*Contract,* Public works, Specifications, Building contract, Performance and breach. *Public Works,* Extra Work, Specifications, Delay.

Although in an action on a construction contract the master to whom the case had been referred had failed to make certain necessary findings, this court did not recommit the case to the master for further findings or order the claims to be tried by a judge, where the case was nearly ten years old, where no facts were in dispute, and where the case could be decided by construing the relevant contract documents. [323-324]

A provision in a public works contract which imposed on the contractor the burden of bringing an excavation to the correct grade should "the excavation for slabs be carried, through error, beyond the depth and dimensions" called for did not bar the contractor from recovering for extra excavation and foundation work necessitated not by an error of the contractor, but by the presence of excessive loose ledge in a portion of the construction site. [324-325]

Although a provision in a public works contract required the contractor to supply temporary light and power, the contractor was entitled to recover the extra cost of erecting poles and stringing 4,000 feet of lines to bring power to the site, where the contractor could reasonably have assumed, based on usual industry practice, that the failure of the plans and specifications to show the location of the tie-in to an electrical source indicated the contact point was at or near the project site. [325-326]

The contractor on a public works project was not entitled to recover the cost of supplying temporary heat on the project site despite its claim that it was entitled to do so as a result of a notice published by the Bureau of Building Construction, and a related memorandum, to the effect that temporary heating on such projects would be furnished by the awarding authority, where the contract in question unambiguously imposed all costs for temporary heating on the contractor, and where the contractor never took any of the required steps to settle the apparent inconsistency between the contract and the standards and memorandum issued by the bureau. [326-329]

A contractor on a public works project for the Commonwealth was not entitled to recover damages resulting from delay caused by another

contractor and by the Commonwealth's failure to remedy the situation, where the contract provided that the contractor could have no claim for damages on account of delay caused by the Commonwealth or other contractors, and where the Commonwealth had acted reasonably in assenting to the contractor's requests for extensions of the completion date and for rescheduling the work. [329-330]

CIVIL ACTION commenced in the Superior Court on October 12, 1976.

The case was heard by *William Highgas, Jr.*, J., on a master's report.

*Christopher H. Worthington*, Assistant Attorney General, for the Commonwealth.

*Marshall J. Handly (Barry J. Gordon* with him) for the plaintiff.

KASS, J. Much in this case illustrates and underscores the skepticism we expressed in *Glynn* v. *Gloucester,* 9 Mass. App. Ct. 454, 462-463 (1980), about the wisdom of referring cases to masters. Too often, "delay, extra expense and frustration" result. *Id.* at 463. See also *O'Brien* v. *Dwight,* 363 Mass. 256, 279-280 (1973). The complaint in the case at bar was filed October 12, 1976. Until the Superior Court issued a conditional notice of dismissal, the parties allowed the case to idle on the docket for four and half years. The reference to a master was made on October 21, 1981. Two years later, October 7, 1983, the master filed his report. As will appear, the report was not a satisfactory one. To be sure, construction dispute cases — and this is one — sometimes involve extensive fact finding from a mass of technical detail, and, therefore, are prime candidates for reference to a master. If, however, as in *Glynn* v. *Gloucester,* and the instant case, the major questions turn on interpretation of the governing contract, it is likely that a judge will be able to produce a shorter trial, faster resolution, and a more reviewable record.

We pause to explain what the case is about. Joseph E. Bennett Co., Inc. (Bennett), acted as the general contractor to build a 450-bed facility (requiring nine new buildings as well as renovations of certain existing ones) at M.C.I., Bridgewater. The master determined that the Commonwealth was liable to

Bennett for six categories of claims. The judge who heard the Commonwealth's objections to the master's report and Bennett's motion to adopt the report adopted the master's conclusion that the Commonwealth was liable to Bennett in the amount of $491,411. Judgment entered accordingly. On its appeal, the Commonwealth challenges four of the six categories of damages found by the master: (1) the blasting and excavation claim ($15,960); (2) the temporary electric power claim ($24,616.30); (3) the temporary heat claim ($111,626.92); and (4) the delay claim ($251,953.92).

1. *The master's report.* As to all four claims the question was not so much what the contractor did, but what it was required to do under the construction contract. It is a conspicuous failing of the master's report that it contains no specific references (by section, paragraph or text) to the contractual provisions which the master applied and interpreted. Those texts are indispensable to analysis of the legal questions which the parties dispute. *Glynn* v. *Gloucester,* 9 Mass. App. Ct. at 458. The Commonwealth failed to repair the deficiency when it filed objections to the master's report. Although the Commonwealth objected to the imposition of liability "without support therefor in the contract documents," it referred to no portions of the contract documents which the master or a reviewing court ought to examine. Similarly, the Commonwealth objected that the "contract imposes the responsibility of costs for temporary heat upon the contractor and not upon the awarding authority" but did not isolate any contractual provisions upon which it relied.

In twenty-eight of forty-one objections, the Commonwealth requested the master to summarize the evidence. The objections refer the master to no portions of the record in which the evidence the Commonwealth desires to be summarized appears. See *Miller* v. *Winshall,* 9 Mass. App. Ct. 312, 315-316 (1980). The master never did summarize the evidence and the Commonwealth did not move the court to order the master so to do, a motion which would have required the accompaniment of affidavits setting forth the evidence as the Commonwealth

thought the master ought to have prepared it. *Id.* at 316.[1] Into its objections, the Commonwealth wove a motion to strike the report. *Id.* 315.

In light of the age which the case has already attained (it is, after all, going on ten), we think it unwise to make either of the most apparent institutional responses, viz., to recommit the case to the master for further findings or to discharge the order of reference and to direct a judge to try the four claims still in dispute. Such a course would be appropriate if the on-the-job facts were still in dispute. They are not,[2] and we are in as good a position as a master or trial judge to construe the legal meaning of the contract documents. See *Markell* v. *Sidney B. Pfeifer Foundation, Inc.,* 9 Mass. App. Ct. 412, 429 (1980). Compare *Thomas O'Connor & Co.* v. *Medford,* 16 Mass. App. Ct. 10, 14-16 (1983). Those documents, although not incorporated in the master's report, were made part of the record by the judge who heard the motion to adopt the master's report.

2. *The blasting claim.* There was ledge in a portion of the site which it was necessary to blast. When the blasting hole reached the prescribed depth for footings and foundation walls and floors, the excavation was found to contain excessive loose ledge, not suitable as a base for a concrete floor. To reach solid material, it became necessary to remove six feet of loose ledge and then, to bring the foundation hole to the elevation required by contract, the contractor had to replace the shattered ledge with gravel. In order to have the floor at the right grade it became necessary to extend the concrete foundation walls. The contractor claimed an extra for this work.

---

[1] As the order of reference in this case was made before July 1, 1982, the governing procedure before the master and on judicial review of the master's report was that which pertained prior to the amendment of Mass.R.Civ.P. 53 in 1982. See *Pollock* v. *Marshall,* 391 Mass. 543, 554 n.9 (1984). Rule 53, as amended, appears at 386 Mass. 1237 (1982).

[2] Indeed, dispute over the physical facts would scarcely be profitable as a master's subsidiary findings are to be accepted unless clearly erroneous. Mass.R.Civ.P. 53(e) (2), 365 Mass. 820 (1974). See now Mass.R.Civ.P. 53(h) (1), 386 Mass. 1242 (1982).

Several sections of the construction contract, §§ 2-10.2, 2-10.3, 2-10.4, and 2-10.11, deal with difficult soil conditions and allocate the economic burden between the parties. Another, § 3-16, deals with, and provides compensation for, additional concrete required to adjust to unanticipated soil conditions. The Commonwealth, in defense to Bennett's claim, relies on § 2-10.11, a provision which imposes on the contractor the burden of bringing an excavation to the correct grade should "the excavation for slabs be carried, through error, beyond the depth and dimensions" called for.[3] The master found (such we take to be the import of his observation that there was no evidence to the contrary) that Bennett's blasting and excavation were neither negligent nor improper, i.e., they were free from error. To the extent corrective work became necessary, it was a function of physical conditions rather than a mistake by the contractor. We read § 2-10.11, the full text of which we set forth in the margin,[4] as placing the onus on the contractor only if the hole gets too deep because the contractor has erred. Here the excavator worked to the prescribed depth and, so the master found, the nature of the ledge, not anything the contractor did or did not do, required additional digging. So much of the judgment as awarded $15,960 on account of extra excavation and foundation work was, therefore, correct.

3. *Temporary electricity.* Under §§ 1-19 and 25-05, the contractor (through the electrical subcontractor) was to supply temporary light and power until permanent feeders were in operation. Nothing in the specifications indicates the location of the Brockton Edison Company (Edison) contact point from which temporary feeder lines might run. The master found that

---

[3] Whether "excavation for slabs" is to be distinguished from "excavation for foundations" is not clear. The parties proceed as if the phrases are interchangeable in the contract.

[4] "If any part of the excavation for slabs be carried, through error, beyond the depth and dimensions indicated on the drawings called for in the specifications, the Contractor shall, at his own expense, furnish and install gravel, stone or approved earth, and shall fill to the proper elevation in accordance with the procedure hereinafter specified for backfill, or if under footings, the heights of the footings, shall be increased with concrete."

it was the policy of the State Bureau of Building Construction (BBC), if the tie-in point was not on site, to show the exact location where the link could be made. He further found that the plans and specifications induced a "reasonable expectation that electric power would be provided at or near the contract project site." The Commonwealth's consulting engineer estimated $5,000 as the cost of providing temporary light and power, from which it might be inferred that the engineer thought a power source was available on site. That assumption was mistaken by over 4,000 feet and Bennett was obliged to erect poles and string lines to cover the distance, at an alleged cost of $24,616.30.

Much as in *Richardson Elec. Co.* v. *Peter Francese & Son, ante* 47, 50-52 (1985), the failure of the plans and specifications to locate the contact point for temporary power, coupled with what was found to be usual practice, caused the contract documents to be misleading. The Commonwealth draws no strength from *Albre Marble & Tile Co.* v. *Goverman,* 353 Mass. 546, 549 (1968), upon which it relies. That case states the proposition that public contractors are held to strict compliance with plans and specifications. There is no finding that Bennett deviated from the contract documents. Rather, Bennett adhered to those documents as they are reasonably to be construed. The Commonwealth fares no better with its argument that it can be liable only if contract documents affirmatively misstate information. See *Alpert* v. *Commonwealth,* 357 Mass. 306, 321 (1970). Omission joined with other facts can produce a misleading expression of contract requirements. *Richardson Elec. Co.* v. *Peter Francese & Sons, supra,* at 51-52. So much of the judgment as awarded $24,616.30 on account of extra costs in connection with providing temporary light and power was, therefore, correct.

4. *Temporary heat.* Section 1-18 of the supplementary general conditions to the general contract required the contractor to provide temporary enclosures and heat to permit work to

be carried on from November through March. That provision was in conformance with St. 1970, c. 497.[5]

Acting under the statutory injunction to establish standards for weather protection and temporary heat, the Director of Building Construction published a public notice on September 28, 1970, addressed to all public awarding authorities, which dealt with such questions as: what parts of the construction work place were subject to the statute (excavation, pile driving, steel erection, and roofing, for example, were not); the minimum temperature to be attained at the work surface; use of the permanent heating system during construction; ventilation; and so on.[6] That set of standards required the general contractor to "submit in writing . . . for approval . . . his proposed methods for '[w]eather [p]rotection'" and provided that "[a]t the option of the awarding authority an allowance may be set up for payment of weather protection."

Two days later, on September 30, 1970, the chief examining engineer of the BBC issued a memorandum to "All Designers and Examiners" directing that the standard supplementary general conditions to State construction contracts contain the following in connection with temporary heating: "The Commonwealth will furnish energy (i.e., steam, water, gas, oil, electricity, etc.) for [t]emporary [h]eating . . . . The energy supply will be reduced or discontinued if in the opinion of the Bureau

---

[5] Statutes 1970, c. 497, added to G.L. c. 149, § 44C, as appearing in St. 1956, c. 679, § 1, the following paragraph: "Every contract subject to [§ 44A] shall include specifications for the installation of weather protection and shall require that the general contractor shall install the same and that he shall furnish adequate heat in the area so protected during the months of November through March. Standards for such specifications shall be established by the director of building construction in the executive office for administration and finance." Old § 44C was struck by St. 1980, c. 579, § 55, and a new § 44C was inserted, which has as its subject debarring contractors from bidding on public contracts. Old § 44C now appears in § 44F.

[6] The public notice and a related memorandum were contained in an exhibit (no. 38) which was not appended to the master's report, although he referred to Exhibit 38. That exhibit was placed before the court and the parties agree that papers in the exhibit are properly before us. See *Russell v. Russell,* 18 Mass. App. Ct. 957, 958 (1984).

it is wastefully used." No such language appeared in the contract documents which Bennett signed July 23, 1971. Nevertheless, Bennett argued below and does here, that the policy enunciated by the BBC about supplying energy had the force of a regulation or law which amended the contract. Bennett points to article XII of the contract which provides: "The Contractor shall keep himself fully informed of all existing and future State and National laws and Municipal ordinances and regulations . . . in any way affecting the conduct of the work . . . and of all provisions required by law to be made a part of this contract, all of which provisions are hereby incorporated by reference and made a part thereof."

The master accepted this theory and awarded Bennett $111,626.92 on account of energy costs and manpower for temporary heat. We need not decide whether the only regulations referred to in article XII of the contract are municipal regulations, nor need we decide whether a memorandum to designers and examiners rises to the status of a law within the meaning of the contract — although we are skeptical in that regard. It is sufficient to observe that, on the record before us, Bennett never took the step required by the sentence which follows those in article XII of the contract upon which Bennett relies. That sentence provides: "If any discrepancy or inconsistency is discovered in the plans, drawings or specifications . . . for this work in relation to any such law, ordinance, regulation, order or decree, he [i.e., the contractor] shall forthwith report the same to the Architect and the Bureau in writing." Nor does the record suggest that Bennett submitted a proposal for weather protection or sought an allowance for payment for weather protection as the standards published on September 28, 1970, provided.

As executed, the contract unambiguously imposed all costs attendant to temporary heating upon the contractor. To the extent the BBC memorandum suggested an obvious inconsistency or discrepancy in the specifications, it was an occasion where the contractor should at least have asked for clarification "to bridge the crevasse in his own favor." *Beacon Constr. Co.* v. *United States,* 314 F.2d 501, 504 (Ct. Cl. 1963). *John F.*

*Miller Co.* v. *George Fichera Constr. Corp.,* 7 Mass. App. Ct. 494, 499 (1979). That principle is all the more applicable since the language of the contract, the standards published September 28, 1970, and the memorandum of September 30, 1970, provided procedures which would have averted misunderstanding about the allocation of costs for temporary heat. The contractor is bound to the precise terms of its contract. *Albre Marble & Tile Co.* v. *Goverman,* 353 Mass. at 550. Accordingly, it was error to make an award to Bennett for temporary heat.

5. *Delay.* Bennett's work on the job was grievously delayed by a contractor, Coronis, responsible for building a new power plant. The master describes Coronis as obstructive and the Commonwealth's efforts to coordinate the work of the contractors as woefully inept. There were on-site meetings among the contractors, the BBC, and the architects. They came to nothing. The master found that Bennett was delayed a full year and that the Commonwealth's failure better to coordinate work and discipline Coronis "was akin to being arbitrary and capricious, and almost cavalier." He found damages on account of delay of $251,953.92.

Article XI of Bennett's contract with the Commonwealth provided that the contractor could have no claim for damages on account of delay caused by the BBC or other contractors. The language of article XI is strong, broad, and unambiguous.[7] When a similar provision was considered in *Wes-Julian Constr.*

---

[7] The full text of article XI is as follows:

"The Bureau may delay the commencement of the work, or any part thereof, for any reason if the Bureau shall deem it for the interest of the Commonwealth so to do. The Contractor shall have no claim for damages on account of such delay unless the Director shall otherwise determine, but shall be entitled to so much additional time in which to complete the whole or any portion of the work required under this contract as the Architect shall certify in writing to be just. The Contractor shall have no claim for damages on account of any delay on the part of the Bureau or another contractor in connection with the execution of the work covered by this contract. The Contractor shall have no claims for damages on account of any delays caused by the work of other contractors of the Bureau now or hereafter doing work upon the premises covered by this contract."

*Corp.* v. *Commonwealth,* 351 Mass. 588, 594-597 (1967), the court observed that there was before it a carefully drawn agreement dealing with a large project and that it would be slow to conclude "that the parties meant to limit the broad power of the [Commonwealth], expressly conferred upon it, to delay the work." *Wes-Julian Constr. Corp.* v. *Commonwealth, supra* at 596. See also *Chas. T. Main, Inc.* v. *Massachusetts Turnpike Authy.,* 347 Mass. 154, 162 (1964). We are similarly unwilling to read the delay provision out of the contract.

Bennett asks for relief from the rigors of the delay clause on the authority of *Farina Bros. Co.* v. *Commonwealth,* 357 Mass. 131, 138-139 (1970). There, the court determined, the Commonwealth had used a similarly powerful "no delay" provision "to whipsaw the contractor." *Id.* at 138. The Commonwealth had hampered and delayed the contractor in its work at the same time as it had refused to grant the contractor extensions to complete the work. In such circumstances the court held that the Commonwealth had acted arbitrarily and in breach of the contract. The damage, the court said, arose not "from the Commonwealth's exercise of the privilege of delay or changing the time of performance but from the complete failure of its agents promptly to afford to the contractor the protection of extensions and the opportunity to reschedule its work during performance." *Id.* at 139.

By contrast, in the case at bar, the Commonwealth assented to extensions in Bennett's date of completion and agreed to its shutting down the job in the interest of better coordination. Certain amounts were paid to Bennett to compensate it for expenses incident to delay and poor job coordination. Bennett was doubtless discommoded and caused significant expense by inadequate job coordination, but it was not whipsawed. The award of $251,953.92 on account of delay was erroneous.

The judgment is vacated and a new judgement for Bennett shall be entered in an amount of $130,429.69,[8] plus statutory

---

[8] $15,960 for the blasting claim, $24,616.30 for the electric claim, plus $89,853.39 in unappealed claims.

interest. As to how the interest should be calculated, see *Thomas O'Connor & Co.* v. *Medford,* 20 Mass. App. Ct. 761, 763-767 (1985), which deals with the computation of interest when, as here, the judgment is affirmed in part on appeal.

*So ordered.*