Billings, Thomas P., J.
For want of a nail the shoe was lost; For want of a shoe the horse was lost; For want of a horse the battle was lost; For the failure of battle the kingdom was lost —-All for the want of a horse-shoe nail.[1]
Disregard of seemingly small details can have costly consequences. At issue in this case is whether, and in what amount, the plaintiff {“XL”), as surely and sub-rogee of general contractor Roads Corporation (“Roads”), may recover damages incurred as a result of a two-year delay in a roadway reconstruction and bridge replacement project at Winter Street, Waltham. The delay resulted from MassHighway’s failure to arrange and accomplish certain utility relocation work that it knew needed to happen before Roads could begin construction. After it mobilized and while it was still waiting for the utilities, Roads failed. XL stepped into its shoes, ultimately completing the project successfully with another contractor, but at significant cost.
XL seeks compensation over and above the contract price, in the amount of $5,215,513. It is entitled to most of this amount, but not all. For the reasons that follow, judgment is to enter in favor of XL, in the principal amount of $3,853,453.
FINDINGS OF FACT
The case was tried to me, jury-waived, over nine days between September 5 and September 17, 2012. There were ten witnesses and 727 exhibits. Based on the credible evidence and the reasonable inferences therefrom, I find the following facts.[2]
A. The Parties.
1. XL is a Delaware corporation licensed to issue construction contract surety bonds in Massachusetts. It issued both performance and payment bonds on behalf of Roads for the project in question.
2. Until 2009, the entity responsible for administering most public road and bridge construction projects in Massachusetts was known as the Massachusetts Highway Department (“MassHighway”). On November 1, 2009, pursuant to G.L.c. 6C, MassHighway and several other agencies were integrated into the Massachusetts Department of Transportation (“MassDOT”).
3. MassDOT is a department of the Commonwealth, organized and existing pursuant to G.L.c. 16, §1. It is, as MassHighway was, headquartered in the Transportation Building at Ten Park Plaza, Boston and has various district offices throughout the Commonwealth. The project at issue in this case fell within the jurisdiction of the District 4 office, located at 519 Appleton Street, Arlington.
B. The Winter Street Project and Contract.
4. In late summer 2004, MassHighway solicited bids for the construction of a project called “Roadway Reconstruction and Bridge Replacement (W-04-025) on Winter Street at Interstate 95, Federal Aid project No. BR-001S(072)” (the “Winter Street project”). The project was to replace a four-lane bridge carrying Winter Street, Waltham over Interstate 95 with a new, seven-lane bridge, and to construct a new collector/distributor roadway at the interchange for 1-95 northbound. Because the bridge was critical to both vehicular traffic over it[3] and utility lines that had, over the years, been installed under it, all understood that the work must be completed without interruption to either, as further described below.
5. The project was initially proposed by the Ciiy of Waltham..The City retained Rizzo Associates to develop the design in tandem with a structural engineering firm, Edwards and Kelcey. The design work began in August 1999.
6. At some later date, the project was approved for state funding and ultimately, for federal-funding, with an 80/20 federal/state funding ratio.
7. MassHighway and the City formalized their relationship for the project’s actual construction in a “City/Town Agreement” dated December 2004. (Ex. 12.) Under the agreement, MassHighway agreed to put the project out to bid; to construct, oversee and administer it; and to participate in its cost up to a 10% overrun; the City agreed to pay anything over this. Rizzo would do the design, with the Ciiy taking respon *149 sibility for any costs caused by errors in the plans or by extras ordered by the City.
8. Subject to the requirements of the public works procurement law {Chapter 30 of the General Laws), MassDOT was in sole control of the procurement process, including the bid solicitation, the award and execution of a contract, and the issuance of a Notice to Proceed.
9. MassHighway advertised the project on or about June 26, 2004. Sealed bids were opened on or about September 21, 2004.
10. There were several bidders, whose bids were relatively close in price. Roads was deemed the lowest responsible bidder and was awarded the contract on or about November 23, 2004.
11. Upon notice of the award, Roads was required to execute a contract within 14 days, on pain of forfeiting 5% of the bid amount (about $950,000). Roads and MassHighway executed the contract on or about December 1, 2004. The contract price was $19,055,914.
12. The contract specified the construction sequence and required that the construction proceed in several phases. In its simplest form, the schedule was as follows:
a. In Phase I, a new two-lane bridge would be constructed abutting, and immediately to the north of, the existing four-lane bridge. Just to the north of and abutting the new bridge, a temporary two-lane bridge (known in the trade as a “Bailey” bridge) would be constructed.
b. In Phase II, the existing four-lane bridge would be demolished and replaced with a new structure wide enough to handle five lanes of traffic. Vehicular traffic would be diverted to the structures erected in Phase I during the Phase II work.
c. The Bailey bridge would then come down, and what was left—all new construction—would carry four lanes eastbound and three lanes westbound.
13. The contract (Ex. 1A, six pages from the end, at Clause 2, last sentence) specifically incorporated MassHighway’s Standard Specifications for Highways and Bridges—long known as the “Blue Book”[4]—of which the 1995 edition (Ex. IB) and the 2002 supplement (Ex. 1C) constituted the then-current version. The Standard Specifications included the following provisions (among many others).
14. The project’s Engineer was to be “[t]he Chief Engineer of the Department acting directly or through an authorized representative, such representative acting within the scope of the particular duties entrusted to him/her.” (Ex. 1C, sec. 1.19.) Under section 5.01,
The Engineer shall decide all questions which may arise as to the interpretation of the plans and specifications, and the Engineer may alter, adjust and approve same when necessary; all questions which may arise as to the quality, quantity, value and acceptability of materials furnished or to be furnished and work performed or to be performed; all questions which may arise as to the progress of the work and need for and manner of correcting same; and also the need for and terms of delays and suspensions; all questions relating to the need for and terms of extra work; all questions relating to the supervision, control and direction of all work on the site and the use thereof; [and] all questions as to the acceptable fulfillment of the Contract on the part of the Contractor.
The Engineer was also responsible for “approval... of supplemental plans or detail drawings,” including “shop drawings . . . submitted to the Department for review and approval.” (§5.02.)
15. The Contractor was to cooperate with, and take direction from, the Engineer.
The Contractor shall submit, to and for the comments of the Engineer, a schedule of operations within ten days after the mailing of the executed contract to the Contractor. The schedule shall show the proposed methods of construction and sequence of work and the time the Contractor proposes to complete the various items of work within the time specified in the Contract. . . (§8.02.)
The Contractor shall commence work within 15 days after the mailing of the executed Contract to the Contractor unless otherwise ordered in writing by the Engineer, and the Contractor shall thereafter prosecute the work at such places and in such order as the Engineer may from time to time prescribe... (§8.03.)
The Contractor shall so carry on his/her work under the direction of the Engineer that Public Service Corporations, or Municipal Departments may enter on the work to make changes in their structures or to place new structures and connections therewith without interference, and the Contractor shall have no claim for, or on account of any delay which may be due to or result from said work of Public Service Corporations or Municipal Departments. No allowance of any kind will be made except as provided in Subsection 8.10. Nothing contained herein shall be construed to hold the Contractor responsible for any acts or omissions by such Public Service Corporations or Municipal Departments. (§5.05.)
16. Subsection 8.05, titled “Claim for Delay or Suspension of the Work,” read as follows:
The Contractor hereby agrees that he/she shall have no claim for damages of any kind on account of any delay in commencement of the work or any suspension of any portion thereof, except as hereinafter provided.
Provided, however, that if the Commission in their judgment shall determine that the performance of *150 all or any major portion of the work is suspended, delayed, or interrupted for an unreasonable period of time by an act of the Department in the administration of the Contract, or by the Department’s failure to act as required by the Contract, within the time specified by the Contract (or if no time is specified, within a reasonable time) and without the fault or negligence of the Contractor, an adjustment shall be made by the department for any increase in the actual cost of performance of the Contract (excluding profit and overhead) necessarily caused by the period of such suspension, delay or interruption. No adjustment shall be made if the performance by the Contractor would have been prevented by other causes even if the work had not been so suspended, delayed or interrupted by the Department.
No claims shall be allowed under this Subsection for the Department’s failure to act as required by the Contract, within the time specified by the Contract (or if no time is specified, within a reasonable time) for any cost incurred more than two weeks before the Contractor shall have notified the Department in writing of his/her claim due to the Department’s failure to act.
The contractor shall submit in writing not later than 30 days after the termination of such suspension, delay or interruption the amount of the claim and the breakdown of how the amount was computed in accordance with Subsection 9.03B[5] except no allowance for overhead and profit shall be allowed.
Any dispute concerning whether the delay or suspension is unreasonable or any other question of fact arising under this paragraph shall be determined by the Commission, and such determination and decision, in case any question shall arise, shall be a condition precedent to the right of the Contractor to receive any money hereunder.
The Contractor further agrees that the sole allowance for any such delay or suspension, other than as provided above, is an extension of time as provided in Subsection 8.10.
17. Also on December 1, 2004, Roads and XL, as principal and surety, executed the required payment and performance bonds, each in the penal sum of $19,055,914.00 (the contract price). Under the Performance Bond (Ex. 14), XL promised that should the contract be abandoned by Roads or terminated by MassHighway, it would “take such action as is necessary to complete said contract.”
C. Wires in the Way.
18. Pre-construction, there were utility poles at either end of the existing bridge on the north side. They carried wires for the following utilities, going in approximate order from the top down: NStar Electric (electricity), MCI-WorldCom (data), Comcast (data), NStar Communications (data), RCN (data), and AT&T (data). Additionally, KeySpan had a gas main under the existing bridge, Verizon had telephone and data lines in conduits there, and the City of Waltham had electric street lights atop the bridge, illuminating the roadway. Finally, there was an ITS camera (“intelligent transportation systems,” an advanced form of traffic monitoring) mounted atop the bridge.
19. All of these utilities—but especially the wires and the two poles supporting them—were located in the way of the Phase I work, and therefore needed to be relocated before construction of the bridge could start. In fact, neither of the first two items in the Phase I critical path—(1) installation of temporary earth supports, and (2) construction of two abutments (one on either end) and three piers (supporting the bridge between the abutments) for the new permanent bridge and the Bailey bridge—could begin until the poles were taken down and the wires they carried had been moved to a temporary location, along with KeySpan’s gas main and Verizon’s conduits. Among the reasons for this was that a crane was needed to construct the foundations of the earth supports, abutments, and piers.[6] For safety and legal (OSHA) reasons, crane operators will not work in the immediate vicinity of live high-voltage power lines such as the NStar Electric lines occupying the top position on these poles.
20. MassHighway understood all of this, notified the utilities of it, and reflected it in the contract documents. E.g., Ex. 1A, p. A00801-129 (utility lines must be rerouted and poles removed “in order to allow stage one of the new bridge construction to proceed”).
21. Utilities relocation was not part of Roads’ scope of work under the contract. This meant that MassH-ighway retained responsibility for making it happen.
22. By standard practice and by law, utilities install, repair, and relocate their own transmission lines. Because high-voltage lines are hazardous to linemen as well as to crane operators, the plan was for NStar Electric move its lines first, to a temporary location; then each of the others would do the same in sequence, top to bottom; and when this was all done, NStar Electric would take down the poles, which it owned.
23. Contractually, in a road or bridge construction or repair project that requires utility relocation, the Owner (here, MassHighway) enters into a “force account agreement” with each utility involved.[7] Because this was a federally funded bridge project, each utility was entitled to reimbursement for the labor and materials needed for the work, less the salvage value of what came out, except that work deemed a “betterment” was unreimbursable.
24. The entitlement to and amount of any reimbursement (including exclusion of betterments and deduction for the salvage value of any reusable or recyclable materials) was to be negotiated among the utility, MassHighway, and the Federal Highway Administration (“FHA”). Additionally, the two agencies would need to negotiate their respective shares of any *151 allowed reimbursement, this being considered a “gray area” not necessarily governed by the 80/20 split applicable to construction costs.
25. MassHighway knew at all relevant times that it was responsible for arranging for the utility relocation work, and that this needed to be completed before Roads could begin work on Phase I. MassHighway also knew that with federal funding overseen by the FHA, there would be another layer of approval—and therefore of complexity, communication, and potential delay—to the force account negotiations. (Ex. 7.)
26. On September 13, 2004, MassHighway— through its acting utilities engineer, Guy Rezendes, who was responsible for coordinating utilities work on highway and bridge projects—met with representatives of NStar Electric and several of the other utilities, for the purpose of defining the scope of this work, including the places to which the various transmission lines would be relocated temporarily, then permanently.
27. Rizzo Associates had already met with representatives of NStar Electric on August 11, 2004 to discuss the relocation issue, and had sent its minutes of the meeting to Rezendes and to MassHighway’s Shawn Holland. The minutes reported that NStar Electric said it was willing to begin its work as soon as it had a signed force account agreement, regardless of whether MassHighway had awarded the construction contract, so as to be done and out of the way when construction began; in fact, NStar Electric hoped to be finished by November 15, ahead of the winter weather. It advised Rizzo that the other utilities would expect 90 days from notification to remove their lines and warned that NStar Electric could not compel the others to be prompt, and that in the past, delays had been common. No one from MassHighway attended the meeting, but Rizzo’s minutes with this information were copied to Rezendes and to another MassHighway official, Shawn Holland. (Ex. 5.)
28. NStar Communications (not to be confused with NStar Electric) followed up on September 29, 2004 with a letter to MassHighway, providing a cost estimate for the work and “request[ing] that a force account be established.” (Ex. 8.) It provided an updated estimate on October 14. (Ex. 9.) There is no evidence that MassHighway responded to or acted upon either letter.
D. Bridge of Sighs.
1. The Force Account Agreements.
29. On December 13, 2004, MassHighway issued the Notice to Proceed under its contract with Roads. This “establish[ed] the date of commencement of the work.” Roads therefore mobilized its forces and prepared to begin construction on or about January 17, 2005. (Ex. 1A, §1.27; Ex. 15, 18, 19.)
30. At the time it issued the Notice to Proceed, however, MassHighway had no force account agreement in place with any utility. It would have been feasible and, as this case illustrates, highly desirable to require utilities which needed to relocate their facilities for a state-funded highway or bridge project to submit a scope of work, cost estimate and schedule before the project is put out to bid, and to execute a force account agreement before the start of project construction.
31. There never was, in the evidence, a cogent explanation as to why the force account agreements were not in place such that the utility relocation work could begin on or before the date it issued the Notice to Proceed to Roads (December 13, 2004), or why the force account agreements, once issued, had no schedule for completion of the temporary relocation work that was necessary for Roads to begin.
32. Guy Rezendes, the MassHighway employee responsible for utility issues, testified that MassHighway did not customarily assign a resident engineer to a job until the Notice to Proceed, and that without this, there would be no one to oversee the utility relocation work and the Federal Highway Administration would not have paid for it. It’s always done this way, he said, because the work needs to be coordinated with the contractor, lest (for example) the two utility poles be taken down and left in a location that the contractor wanted to use as a staging area. Finally, Rezendes testified that often there is construction work to be done before the utility work can be done, and “We did not know... at the time” that the reverse was true on this project.
33. All of this may be so (except the last statement, which is preposterous). As valuable as standardized routines can be, however, they can also be paralyzing without someone occasionally applying critical thought to the particular case. There were meetings about the utility relocation issue in August and September 2004; Rezendes was copied on the minutes of the August 11 meeting, then called and attended the September 13 meeting; yet no one—except NStar Electric, briefly—seems to have felt any need to do anything before the contract was awarded, the Notice to Proceed had issued, and the contractor was mobilized and ready to start work.
34. Mr. Rezendes suggested at one point in his testimony that the City of Waltham and Rizzo Associates—not MassHighway—were responsible for coordinating utility work. The paper trail indeed shows that Rizzo called meetings with NStar Electric representatives on May 29, 2001—three and one-half years before the construction contract was awarded—and on August 11, 2004, as well as the meeting that Rezendes requested and chaired on September 13, 2004. From then forward, however, there is no suggestion in the evidence that Rizzo played any continuing role in the utility relocation issue; rather, all the meetings and correspondence on the subject appear *152 to have involved MassHighway (usually Rezendes), the utilities, and sometimes the FHA.
35. In short: MassHighway and no one else was responsible for instigating and coordinating the utility relocation work, and it knew it.
36. MassHighway hosted a pre-construction meeting on Januaiy 12, 2005 at the District 4 Construction office in Arlington. Roads had prepared a Baseline Schedule for the project dated December 13,2004 (Ex. 16), which it provided to MassHighway at the meeting. To anyone schooled in the genre, this schedule clearly showed—and it was a fact already known to MassH-ighway and made explicit in the plans (Ex. 2, sheet 8)—that construction of the temporary earth supports and the drill shafts for the abutments and piers were both critical path items at the beginning of Phase I, and that neither could begin until the utilities had been relocated. The schedule assumed with equal clarity that NStar Electric’s and Keyspan’s utility relocation work would begin on January 26 and would be completed by March 8, 2005.[8]
37. No one from MassHighway questioned this schedule at the meeting, which representatives of some or all of the affected utilities also attended. Someone, however, raised the question: where were the force account agreements? The MassHighway official (Mark Cain) who chaired the meeting knew only that they were not to be found in the District 4 office. He left a voice-mail message that day, then sent an e-mail the next, to Guy Rezendes to find out where they were. Rezendes replied that the agreements were “being processed as we speak. Some are still just rolling in . . .” (Ex. 20.)
38. In fact, far from “rolling in,” no force account agreements had been executed, prepared, or even fully negotiated as yet. Rezendes testified that he might have meant that the cost estimates from the utilities were “just rolling in,” which a few had done.
39. Roads—which on January 7 had mailed notices to the utilities that construction was scheduled to commence on Januaiy 17—learned from NStar Electric on approximately the 17th that it did not yet have a force account agreement.
40. Different utilities provided their scope of work and cost estimates for the relocation work with differing degrees of alacrity, but they met a consistent lack of responsiveness from MassHighway. For example:
a.Comcast had already submitted its materials in the summer of 2004, but as of Februaiy 2005 had heard nothing back from MassHighway. At least through June 2005 its scope of work, including the veiy significant question of whether its lines would remain aerial or would be buried, was still unresolved. (Ex. 78, 254-56, 286.) Eventually, on March 1, 2006, Comcast’s force account agreement was issued.
b. As noted above, NStar Communications made its submission in late September 2004, with an update in mid-October, and no apparent response; its force account agreement did not issue until Februaiy 2006. (Ex. 77.)
c. AT&T, which had submitted its information, was pestering MassHighway for its force account agreement by early July of 2005. It took another sixteen months, until November 1, 2006, for MassHighway to issue it. (Ex. 37, 79.)
41. NStar Electric, whose lines had to come down first, provided a cost estimate on or before Januaiy 20, 2005, but without an intelligible scope of the work for which it requested to be reimbursed $431,000. At the FHA’s request, communicated through MassHighway, it described the work more completely in a letter dated March 25, 2005. It took four more months for Mass-Highway to work out the details with NStar Electric and the FHA. It issued the NStar Electric force account agreement in final form on July 20, 2005. (Ex. 21, 24, 25, 27, 29, 36, 39, 74.)
42. Execution of the document, however, did not trigger execution of the work, either contractually or in fact. All of the force account agreements, as finally drafted and executed, had a completion date for all of the work of June 30, 2009. This was extraordinarily generous to the utilities, and fundamentally flawed. The contract required that the entire bridge project be completed by November 10, 2007. None of the force account agreements included a schedule, a start date, or a completion date for the first part of the work—removal of lines from the existing utility poles to their temporary locations—that had to be completed before work on the bridge could commence.
43. This form of contract represented standard operating procedure at MassHighway, however, and not entirely without reason: utility work was needed at different stages from one project to the next, and the budgeting and paperwork were easier if the contract had a single deadline, usually about four years out, for its completion, even when the construction work had a contract deadline much earlier. Here again, however, project-specific critical thought was sorely wanting: no one at MassHighway appears to have considered breaking tradition and imposing a contractual deadline on the temporary relocation work in this case, notwithstanding the fact that little else could happen until this was done.
44. The result was that NStar Electric and any other utility was free to prioritize other work, unrelated to the bridge project, that did have deadlines ahead of the utility relocation work that did not. NStar Electric, at least, took full advantage.
2. The Utility Relocation Work Begins.
45. More than two months after its force account agreement was executed, on September 23, 2005, NStar Electric began its relocation work. KeySpan *153 (whose gas lines did not need to wait for NStar Electric’s work, and would not have prevented anyone else’s work from proceeding) began on September 28.
46. KeySpan finished up on October 20, 2005. The rest of the utility relocation work—both paperwork and physical work—however, continued at the same gentlemanly pace at which it had begun.
47. NStar Electric—whose wires needed to be relocated before the others could begin—appeared on the site only sporadically, finally finishing up on September 22, 2006, fourteen months after its force account agreement was issued and a full year after it began the work. MassHighway issued the force account agreement for the last utility in line—AT&T—even later than this, on November 1, 2006, and AT&T and Comcast both finished their work on March 28, 2007. Meanwhile, Roads waited to begin Phase I.
48. MassHighway takes the position that the utilities—especially NStar Electric—were exclusively responsible for the slow progress of the work. The evidence, however, is to the contrary. In keeping with its desultory performance in getting the force Account Agreements in place, and its equally costly failure to include any schedule or deadline for completing the temporaiy relocations, MassHighway did little to instill a sense of urgency in NStar Electric or anyone else.
49. From time to time Mark Hayden, the resident Engineer assigned to the project, would inquire of NStar Electric when it might start and if he might have a schedule. Entries in his project diary record thirteen such requests, on January 20, 2006 (the six-month anniversary of the issuance of NStar Electric’s force account agreement), February 15, March 14, April 5, April 27, May 5, May 16, June 12, June 21, June 27, and October 2, 2006.[9] Most of these entries indicate that Hayden left a message for NStar Electric’s Brian McDevitt, who did not call him back.[10] When Hayden did hear from McDevitt, the news was not encouraging:
May 5, 2006: “[McDevitt] said that his corporate office has prioritized other work for their subcontractor and that MassHighway may have to go to the corporate level to get NStar to return to this project.” (Ex. 386.) (From this, one may infer that NStar Corporate correctly understood that the form of force account agreement prepared by MassH-ighway left the utilities with no obligation to accommodate the project’s schedule.)
May 16, 2006: “He has spoken to his superiors and does not know when NStar subcontractor will be on project.” (Ex. 393.)
June 27, 2006: “B McDevitt called and left message that this project is not on their horizon and he doesn’t know when they will return.” (Ex. 409.)
50. This last apparently was, at last, too much, and Hayden decided to call for the heavy artillery. On July 13, 2006—two and one-half weeks after McDevitt’s voicemail and one week short of a year after issuance of the NStar Electric force account agreement— MassHighway’s Chief Engineer, John A. Blunde, wrote to Brian McDevitt, and told him to get moving. (Ex. 165.) This is the only written communication on this issue in the evidence, and the only record of involvement in it by a high-level MassHighway official.
51. NStar’s response, if any, does not appear in the record, but Blunde’s letter seems to have produced results, albeit not instantaneously. The next time an NStar Electric crew showed up was more than a month later, on August 16. (Ex. 433.) They were on the site eight days in August, five in September, and nine in September, finishing the temporaiy relocation work on the twenty-second.
52. All in all, NStar was present in some form on the site for portions of about 55 days in the fourteen months between issuance of the force account agreement (July 20, 2005) and completion (September 22, 2006). This is, on average, less than one day a week. It returned on five more days (September 25 and 26, October 3, 2006 and March 23 and April 3, 2007), apparently for other work, including removal of the poles after the other utilities had taken their wires off them.[11]
53. Appendix A to this decision is a chronology of major events pertinent to the utility relocation issue— particularly, with respect to each utility, the dates that a force account agreement was issued, the work began, and the work was completed.[12]
54. The time elapsed between Roads’ original scheduled completion date for the utility relocation (March 8, 2005) and the date that the utility work was completed (March 28, 2007) was 749 days.
3. Mitigation Through Out-of-Sequence Work.
55. Because the utility relocation work came ahead of the first critical path item for Phase I of the project, there was little of importance that Roads could accomplish during this period. Its Project Manager, Joseph LaMarre, sent written notices to Mass Highway of this fact, often accompanied with a revised schedule and an advisory that it would be looking for compensation for the delay at a later date, on (at least) February 3, 2005 (Ex. 23), April 6, 2005 (Ex. 30), April 26, 2005 (Ex. 31), June 8, 2005 (Ex. 35), July 22, 2005 (Ex. 40, 41), and February 2, 2006 (Ex. 51). The July 22, 2005 schedule—prepared eight months before the temporary relocation work was finally completed—had the project completion date pushed out to April 15, 2009, seventeen months after the original date.[13]
56. Almost all of the project’s work was on the critical path (i.e., needed to be performed in sequence), meaning that it had to wait for the temporary utility relocations. An exception was construction of a “soil nail wall,” an earth retention system in which steel rods are driven into the soil, then grouted at the *154 surface, grid-wise, in order to stabilize an earthen embankment. This was adjacent to a deceleration lane, well to the south of the bridge on the northbound side of 1-95, and therefore was not impacted by the delay in the utility relocation work; nor did it need to be accomplished for other work to proceed. Had it not been for this delay, this work would have been performed alongside and simultaneously with the critical path work on the bridge.
57. MassHighway directed Roads to perform this “out of sequence” work while it was waiting for the utility relocations. Roads occupied itself for a time with this and also did some out-of-sequence drainage system work in the same area. Roads thus received some progress payments and mitigated its damages to a degree, but neither the soil nail wall nor the drainage work contributed anything toward the project’s readiness for the commencement of Phase I.
4. Carrara and the Bulb Tees.
58. The finished bridge was to rest on sixty pre-stressed concrete girders, known in the trade as “bulb tees.” Roads contracted with J.P. Carrara & Sons, a concrete fabricator in Vermont, to make them.
59. Roads’ baseline schedule called for the bulb tees for Phase I of the project to be fabricated and delivered between Februaiy 15 and August 26 and set in place by August 31, 2005. Roads obtained a proposal from Carrara on November 2, 2004, whose business terms formed the basis of. the contract the parties ultimately executed in July-August 2005. [Ex. 11.) The proposal specified delivery dates of August 26, 2005 for Phase I girders and June 2006 for Phase II.
60. It soon became apparent that the utility relocation issue stood in the way, and Roads made periodic adjustments to its schedule to reflect this. Not wanting to incur another delay in the event the site was ready before the bulb tees, however, in late 2005 Roads instructed Carrara to proceed with fabrication. Car-rara did this work in Januaiy-March 2006.
61. Roads, however, became insolvent at just about this time (see below), and defaulted on its obligation (Ex. 11, Schedule A) to pay Carrara monthly, net 30 days, as the bulb tees were manufactured in Carrara’s Middlebury, Vermont facility.
62. There was no room on the project site to store the bulb tees, so at XL’s request, Carrara stored the bulb tees in its yard. Time marched on; Carrara retained counsel, and he wrote to XL on April 17,2007 (Ex. 101) to say that upon payment of the purchase price in full, Carrara would give XL a release of its payment bond obligation, but would not deliver the product until it was also paid its incidental damages (storage, increased delivery costs, and interest).
63. Evidently, XL and Carrara reached an accommodation, the terms of which are not fully fleshed out in the evidence. It appears that Carrara agreed to deliver the beams and transfer title to them upon payment of the purchase price, and XL agreed to pursue the storage claim with MassHighway.
64. XL paid Carrara the balance due on the purchase price on September 19, 2007, then requested and received a progress payment from MassHighway to cover this in the summer of 2008. XL also paid Carrara $75,000 toward the storage costs on April 9, 2008, and Carrara made a claim for direct payment on MassHighway, with a full accounting of the storage charges, in May 2011. (Ex. 121.)
65. The bulb tees were delivered to the site on five dates between October 15, 2008 and March 22, 2011, as they were needed. XL’s claim against MassHighway in this case includes the full amount of Carrara’s storage cost claim.
66. The contract documents between Roads and Carrara (Ex. 11) included the following language:
If, for any reason, Roads cannot take delivery by the required date, material shall be stored in JPC’s yard at no additional cost to Roads. (Proposal, ¶8.)
The Supplier shall have no claim for damages for delays, obstructions to its work, or other such events no matter how or by whom caused. In case of such delays, hindrances, or obstructions not due in any part to the Supplier’s fault, Supplier shall be entitled only to such extension of time or performance as may be allowed, by the General Contractor . . . (Purchase Agreement, Article 10.)
E. Roads Defaults, and XL Steps In.
67. While it waited for the temporary utility relocation work, Roads became insolvent.[14] On or about March 23, 2006, it issued to MassHighway and XL a Notice of Voluntary Default, notifying them that it was financially unable to proceed further with the project. (Ex. 53.)
68. XL, as the issuer of the performance bond, thereupon became responsible for the project’s completion.
69. Soon after it took over, XL suggested that with so little work to do, it would be more economical to “mothball” the site until the utility relocation was complete and the Phase I work could begin, and it requested MassHighway’s permission to do so. MassHighway’s District Highway Director for District 4 (Patricia Leavenworth) and the engineer assigned to the project (Carol Hebb) would have none of it, explaining that the job was “a political hot potato” and could not be seen by the public to have been abandoned.
70. Bridges LLC, the contractor by which XL originally planned to complete the job,[15] therefore maintained a crew of ten to twelve men on the jobsite.
71. On August 23-September 5, 2006, Roads, XL and MassHighway executed a contract (the ‘Takeover Agreement,” Ex. 61), by which XL agreed to “complete the Project in accordance with the terms and conditions of the bonds, the Contract, and the Project’s *155 plans and specifications .. . except as otherwise specified herein.” The parties agreed (a) that Roads had been paid $2,799,896.53 excluding retainage and that there were $54,902.74 in approved change orders, leaving a current contract balance of $16,310,920.21 exclusive of unapproved and/or pending change orders; (b) that four change orders (including one for “Utility Force Account Agreements” whose amount was “unknown”) were pending; (c) that a further progress payment of $61,076.83 would be made to XL within ten days; (d) that the project would be completed by Bridges, LLC; and (e) that each party reserved all claims under the original contract not expressly waived in the Takeover Agreement.
72. Central to the Takeover Agreement was MassHighway’s commitment to
pay directly to the Surety [XL], as same shall become progressively payable in accordance with the Contract, all sums due and payable for services and materials furnished toward the Completion Work, as would have been payable to the Bond Principal [Roads] if there had been no default. (Ex. 61, ¶5.)
73. On November 1, 2006, MassHighway and AT&T executed the last force account agreement needed for the utility relocation work. The actual work was not completed, by all utilities (AT&T being the last to start and the last to finish), until March 28, 2007.
74. During this period, XL realized that, with no end in sight to the utility relocations, it had time to re-bid the job, and it decided to do so. It estimated that at that point, the project was about 15% complete.
75. XL’s consulting engineer therefore called each contractor that had submitted a bid the first time around, and several others, to ask if it would care to bid on the project’s completion by the surety. Several indicated interest. XL prepared a set of bid documents and sent them around, and in due course had a list of seven likely bidders (including Bridges). Four (not including Bridges) actually submitted bids on the due date, October 27, 2006.[16]
76. Three of the bids were clustered between $26.53 million and $27.82 million. The fourth bidder—McC-ourt Construction—came in significantly lower at $19,575,298, and also happened, in XL’s opinion, to be the most responsible bidder. This I take to mean that McCourt appeared the most likely of the four to complete the project competently and successfully, on time, and without trying to augment the contract price through unmeritorious change order requests.
77. On December 1,2006XL and McCourt executed a Completion Contract (Ex. 84), conditioned on execution of a new takeover agreement between XL and MassHighway. For a contract price of $19,575,298, McCourt agreed to
furnish and pay for all labor, materials, services and equipment and [to] do everything else necessary to perform and fully complete the Original Contract as required by the Contract Documents to the satisfaction of the Surely and the Owner in such a manner as to fully protect and save the Surety harmless as to its liability to the Owner for the completion of the Original Contract.
McCourt also acknowledged that work could not commence until the temporary utility relocation work was complete; XL could not warrant the date but agreed that it would not issue a Notice to Proceed until at least April 1, 2007. If the Notice to Proceed was issued after June 1, 2007, McCourt would be allowed to submit a request for adjustment of the contract price based solely on escalation of costs of labor or materials. XL, however, not McCourt, assumed responsibility for one big-ticket item: the bulb tees on which the new bridge would rest, which J.P. Carrara & Sons had fabricated long before and stored ever since, resulting in the aforementioned claim for storage charges.
78. Bridges continued to act as interim contractor over the winter of 2006-07, maintaining a crew on the site as MassHighway had directed, and dealing with problems as they came up.
79. On March 28, 2007 XL and MassHighway executed an Amendment to Takeover Agreement (Ex. 97), effective April 1, 2007, formalizing the substitution of McCourt for Bridges as the Completion Contractor. In all other respects, the Takeover Agreement (Ex. 61) remained in effect, including MassHighway’s agreement to pay to XL “all sums due and payable for services and materials furnished toward the Completion Work, as would have been payable to the Bond Principal if there had been no default.”
80. On March 30, 2007, two days after the last utility line came down and one day after the ITS equipment was removed, XL issued its Notice to Proceed. (McCourt, which had been kept in the loop and was already preparing to start on or about April 1, evidently did not object to the fact that the NTP had come two days early.) Phase I work finally began on April 2, 2007. The project was finally and successfully completed in the summer of 2012.[17] MassHighway has paid XL the balance remaining on the contract price, with some adjustments.[18]
G. XL’s Request for Extension of Time.
81. On April 27, 2007—within 30 days after the utility temporary relocation delay finally came to an end—XL, through counsel, submitted two written requests to MassHighway pertaining to it: one for an extension of time, and the other for monetary compensation.
82. In the first (Ex. 102), XL requested that Mass-Highway extend the original completion date of November 10, 2007 to June 28, 2010, “as a result of MassHighway’s failure to procure force account agreements with the necessary Public Service Corporations such that existing utilities which interfered with scheduled work activities could be relocated.” This *156 would have been an extension of 962 days. The logic articulated for the request was that it would give McCourt the same 1,062 days to complete the project as Roads had been given in the original contract. (Ex. 102.)
83. MassHighway’s District 4 was receptive to the request, but saw what it felt was a minor computational error. It therefore recommended to MassHighway’s Director of Construction on August 31, 2007 that the completion date be extended by 944 days, to June 11, 2010. (Ex. 106, 107, 249.)
84. The higher-ups at MassHighway’s home office, however, declined to extend the contract date for what it knew to be the full period of delay caused by the temporary utility relocation issue, opting instead for a parsimonious and incremental approach.
85. Following instructions from Ten Park Plaza, therefore, District 4 on November 15, 2007 revised its request to 142 days (until March 31, 2008), just enough to “allow the project to keep moving forward.” This was a reference to the facts that the original—and still official—completion date of November 10, 2007 was fast approaching, and that progress payment requests could not be approved beyond that date unless it were extended. (Ex. 108, 634.)
86. In her revised recommendation, Ms. Leavenworth recounted the reason that Ten Park Plaza had advanced for not granting the requested extension all at once:
MassHighway is in the process of negotiating a settlement of a $5.4 million claim on the project filed by the bonding company, XL Specially Insurance. Per advice of EOT [Executive Office of Transportation] legal counsel assigned to assist in the process, MassH-ighway should only be issuing an interim time extension to continue payments until negotiations have been completed with XL Specialty.
[[Image here]]
In order to assist in the negotiation of a $5.4 million claim filed by the bonding company, EOT counsel has recommended issuing an interim extension only through March 31, 2008. (Ex. 108.)
Over the next year and a half, this rationale was reiterated in each recommendation for a further extension of time. (Ex. 247, 114, 116, 244.)
87. On January 2, 2008—nearly two months after the completion date had passed—MassHighway granted the revised request for 142 days.
88. EOT/MassHighway continued with this strategy for at least the next two years:
On March 7,2008 District 4 recommended a second extension of 62 (sic) days, to May 31, 2008. Mass-Highway on April 16, 2008—as before, after the deadline had expired—corrected the math and extended the completion date by 61 days to May 31, 2008. (Ex. Ill, 246, 247.)
On May 20, 2008 District 4 recommended a third extension of 92 days, to August 31, 2008. MassH-ighway again missed the deadline, but on July 16 extended the completion date by 92 days to August 31, 2008, as requested.
Nine weeks after this third deadline passed, District 4 recommended a fourth, 212-day extension, to March 31, 2009, which MassHighway granted. (Ex. 116, 245; see Ex. 244.)
As this date loomed, District 4 on March 10, 2009 recommended 275 more days, to December 31, 2009; MassHighway again granted the request, three weeks late, on April 22, 2009.
Throughout, District 4 acknowledged that the contractor had performed skillfully and expeditiously, and explained each incremental recommendation on the ground that it was acting on EOT counsel’s advice to proceed this way as long as it was “negotiating” a settlement of XL’s monetary claim. (Ex. 108, 114, 116, 247.)
89. The documentary evidence stops there, at 570 days, but there was testimony that there were three more extensions granted on later dates, and that 1,467 days were granted in total. The record does not disclose how many (if any) of these were on account of the temporary utility relocation delays and how many for the later, unrelated delays referenced in footnotes 17 and 18, supra.
90. In short: it would appear that someone in the EOT general counsel’s office was leery about adding to the record of a costly two-year SNAFU of MassHighway’s own making, and/or wished to gain whatever negotiating advantage a phony, near-term deadline might afford in the settlement of XL’s monetary claim. The result was that MassHighway failed in its obligation to grant a meritorious request for extension of time promptly and in good faith.
91. Appendix B is a chronology of the time extensions allowed by MassHighway through the fifth one, which moved the completion date to December 31, 2009.
H. XL’s Claim for Damages.
1. The Gill Analysis, and XL’s April 27, 2007 Claim.
92.XL’s second request of April 27, 2007 (Ex. 103) was for a $5,444,135 upward adjustment to the contract price, also on account of the delayed temporary utility relocations and the resulting delay of more than two years in getting started on Phase I. This claim was based on an analysis performed by Kevin Gill, a consulting engineer with extensive experience employed by Fasano, Acchione & Associates, a firm that consults to sureties. The breakdown was as follows:
Unabsorbed Field Management Costs $ 451,979
Increased Cost—Unit Price Items $ 640,705
Increased Cost—Lump Sum Items $4,053,850
Increased Material/Storage Costs 8 297.601
TOTAL $5,444,135
*157 93. The April 27, 2007 claim letter gave (in greater detail than is recounted here) the following explanation of these items.
a. The originally projected completion date of December 29, 2006 had come and gone, with only $3,578,541 of the work out of a $19,055,914 contract price, or 18.8%, having been completed, leaving 81.2% to go. Between Roads and Bridges, the actual cost of field management to date (project manager, project superintendent, and field supervision) totaled $556,482. 81.2% of this, or $451,979, represented unabsorbed field management costs.
b-c. The increased costs for unit price items and lump sum items each represent the difference between the McCourt bid and the Roads bid for these items. [19]
d. Increased Material/Storage Costs was a reference (i) to the claim asserted by J. P. Carrara & Sons, then in the amount of $226,938, for interest, storage charges, and additional shipping for the bulb tees, and (ii) certain other enumerated materials, priced at $70,663, which had been delivered but for which MassHighway had not yet paid.
94. The April 27, 2007 price adjustment claim was a rational estimate, based on the facts then available, of the damages incurred as a result of the delayed start of Phase I. Like all estimates, this one incorporated certain assumptions. The most significant, dollar - wise, was that the only variable affecting the contract .price was the passage of time and not, for example, to different pricing practices as between Roads and Mc-Court. This assumption finds some support—but as an approximation only—in the fact that back in 2004, McCourt’s bid had been within about five percent of Roads’ bid.
95. On June 21, 2007 District 4’s Patricia Leavenworth wrote to XL, acknowledging receipt of the April 27 claim and requesting additional information. (Ex. 104.) XL responded with this on August 17, 2007. (Ex. 105.) Although oral communications continued for some time, there was no evidence that MassHighway ever provided a written or other formal response to XL’s monetary claim.[20]
96. Under section 8.05 of the Standard Specifications (para, first; see also §1.09), claims for delay damages were to be decided by the five-member Massachusetts Highway Commission. On July 21, 2004, however, the Commission was abolished, and its prior functions transferred to the Secretary of Transportation and the Highway Commissioner. St. 2004, c. 196, §5. There was no evidence in this case, however, that either official considered, acted upon, or even saw XL’s claim.
97. In mid-2012, after the project was completed, Gill examined what XL had actually paid McCourt for both unit price and lump sum items. Because McCourt’s work used fewer units of some unit price items than anticipated, it charged less than Gill had allowed for, based on the bid, in 2007. Gill’s revised computations, based on the actual cost figures, are summarized in a spreadsheet marked (over the Commonwealth’s objection[21]) as Exhibit 719.
98.As Gill recalculated it, the actual amount XL paid McCourt for unit price and lump sum items totaled $4,465,932.54, a reduction of $228,622 from the $4,694,555 ($640,705 + $4,053,850) in his 2007 analysis. This would bring the total increased costs (including these two items, plus unabsorbed field management costs and increased material/storage costs) to $5,215,513, instead of the $5,444,135 originally projected.
99.Gill’s revised computation therefore looks like this:
Unabsorbed Field Management Costs $ 451,979
Increased Cost—Unit Price + Lump Sum Items $4,465,933
Increased Material/Storage Costs 6 297.601
TOTAL $5,215,513
100.Although they have denied that their department is legally responsible, MassHighway and Mass-DOT personnel have consistently acknowledged that the delays in starting Phase I and completing the project were attributable to the utility relocation work; more specifically, to the late issuance of approved force account agreements, and not to any fault on the contractor’s part.[22] For example, four months after McCourt took over, in an August 31, 2007 Interoffice Memorandum (Ex. 107), Patricia Leavenworth wrote that “the Contractor is due additional time of840 days due to utility delays.”[23] As “Pertinent Data Relative to the Progress of Work,” she wrote:
1.Delays caused by this Department, if any: None
2.Delays not caused by this Department, if any: The Contractor has been delayed due to the late issuance of approved Utility Force Account Agreements on the project (7) that has subsequently delayed their relocation work to allow the first phase of bridge construction and demolition to commence. The first approved utility agreement was issued on June 16, 2006 (sic) and the last issued on November 2, 2006 (sic). Even though the Contractor was performing out of sequence work on the project, critical path work was not able to commence until all utilities were cleared on April 2, 1007. Utility relocations have delayed the Contractor a total of 840 days.
3.Has the Contractor performed the work skillfully and expeditiously? Yes
4.Has the Contractor increased its forces? Yes
2. The Stevens Analysis.
101.Gill’s original analysis was, in substantial part, prospective: it was performed while the project was still underway (indeed, just as McCourt was get *158 ting started). Both this and his later refinement computed the cost escalation due to delay solely on the basis of the difference between the bid prices of Roads in 2004 and McCourt in 2007.
102. In 2008, XL retained Glen Stevens, another consulting engineer with extensive industry experience on public works projects, to analyze its delay claim. This he did, in part, in a report dated September 28, 2010, in which he concluded that the period of compensable delay was 754 days, from March 8, 2005 (the date on Roads’ baseline schedule for completion of the utility relocation work) through April 2, 2007 the date McCourt actually began the Phase I work).
103. Stevens was close, but I find that the actual period of delay was 749 days—March 8,2005 to March 28, 2007, which is the date that all of the temporary utility relocation was complete. For the purpose of computing damages, however, the five-day difference (0.66%) is not material, and I have not discounted Stevens’ damages calculations on this account.[24]
104. Stevens has continued to consult to XL as and after the project was completed and, like Gill, he testified at trial, on the causes and length of the delay and on damages.[25]
105. On the subject of damages, Stevens utilized the unit price estimator tool on the MassDOT website to recalculate XL’s claim for cost escalation in the unit price items and the lump sum items.[26] This is a database, accessible to outside users (and likely of greatest interest to contractors assembling a bid on a MassHighway project), in which MassDOT has compiled bid prices for a large array of commodities and tasks in its road and bridge projects over a given date range. The end date of the range is immutable—when Stevens was doing his work, it was set as October 2010—but the user may specify the beginning date.[27] The user also selects the unit of work and the quantity, and can view and print pricing information from Mass-DOT bids in various specified quantify ranges.
106. Stevens was able to determine, for example, that between December 2004 (the date of the Roads contract) and October 2010, there were 42 bids on eight projects utilizing dense graded crushed stone in a quantify between 2753.00 and 4127.50 cubic meters,[28] and that the lowest such bid was $28.75 per cubic meter; the highest, $86.25, the mean, $57.53 and the median, $57.50.
107. To get some idea of price trends, Stevens ran the same query for the date range from December 2007 (the date of the McCourt contract) and the immutable end date of October 2010. Using the same example, he discovered that there were fifteen bids on three projects utilizing dense graded crushed stone in a quantity between 2753.00 and 4127.50 cubic meters, and that the lowest such bid in this timeframe was $33.80 per cubic meter; the highest, $101.39, the mean, $68.88 and the median, $69.18.
108. Not all commodities in the Roads and McCourt bids appeared on the MassDOT database, but Stevens was able to do this analysis with 169 items. He determined that the difference between December 2004-October median prices and December 2007-October 2010 median prices was, on average, an increase of20.72 percent.
109. Stevens also looked at the Means Construction Cost index, a well known and respected tool for estimators and others in the construction industry. There, he learned that between 2004 and 2007, prices of construction materials nationally rose by an average of 16.9 percent, and that the increase in prevailing wages was about the same; perhaps 16.8 or 16.9%; close enough, he felt, to be counted “in the same ballpark” as what he had found using MassDOTs Massachusetts price estimator tool.
110. Applying a 20.72% increase across the board to the $15,754,607 in contract work left to be done would mean an expected increase in the cost of that work, attributable to cost escalation of the unit price and lump sum item costs, of $3,264,355.
111. Stevens also looked at the question of “extended general conditions”—the added administrative costs that result from a project’s taking longer than planned (roughly the equivalent of Gill’s “unabsorbed field management costs”). He derived, from the records of Roads and Bridges, the actual cost of 23 items—salaries for Project Manager, Project Superintendent, and Field Mechanic; on-site equipment and supplies such as a field office, drinking water and ice, dumpsters, portable toilets, safety gear and supplies, fuel and lubricants, electric and telephone bills, and so on; and engineering and survey services, and determined that these ran to $571,288.66 while Roads was on the job and to $86,940.09 for Bridges. He divided each by 838 days (12/13/04-3/3/07) for a per diem rate of $681.73 for Roads and $103.75 for Bridges[29] and multiplied this by 754 days; and arrived at the figure of $592,248.78 for the period of culpable delay.[30] To this, Stevens applied a 10% “mark-up,” for a total figure of $651,473.66.
112.Stevens’s testimony was not explicit as to what the mark-up represents. If (as seems likely) it was on account of home-office overhead or profit, it would not be allowed under section 8.05 of the Standard Specifications. In any event, I have excluded the markup in my assessment of damages; see below.
113.Finally, Stevens added these two figures—for cost escalation and extended general conditions—plus $286,458 for offsite storage by Carrara & Sons.[31] The result is as follows:
Extended General Conditions $ 651,474
Cost Escalation $3,261,204
Offsite Storage 8 286.458
Total Additional Cost $4,199,136
114.Stevens’s computation thus yields total delay damages of just over a million dollars less than Gill’s revised computation, and a little more than $1.2 million less than XL’s April 2007 claim based on Gill’s *159 original computation. Stevens used a more inclusive— and, I find, more accurate—definition of “extended conditions” (the cost of keeping the jobsite open while waiting), and he used an updated (and therefore somewhat higher) figure for Carrara’s storage claim. Most importantly, his cost escalation computation is based on historical trends in a broad sampling of Massachusetts bid prices, rather than comparing the bids of just two contractors (Roads and McCourt).
115. Even so, Stevens’s analysis was not perfect, as he acknowledged. Because of the limitations of the MassDOT price estimator tool, Stevens had to compare prices over a longer period (December 2004-Oc-tober 2010) and a shorter period included within it (December 2007 and October 2010), rather than “snapshots” of bids in a user-selected range around the 2004 and 2007contract dates. Still, there is a good deal of comfort in the facts that Stevens’s calculated price escalation of20.72% was reasonably close to the national average[32] (about 16.9%) for the period 2004-2007, and that the million-dollar difference between Stevens’s and Gill’s figures is closely comparable to the difference between Roads’ and McCourt’s bids for the original 2004 contract.
3. Finding as to Damages.
116. Stevens opined that his work on damages corroborated Gill’s, and that Gill’s figures represented what XL deserved to recover. I agree that there was corroboration, but not in the sense Stevens used the term.
117. Mr. Gill’s work was carefully done and reflected the best available information at the time. I find, however, that Stevens’s analysis more accurately—indeed, very accurately—reflects the actual escalation in costs that XL experienced, and that resulted solely from the passage of 749 (or so) days. The principal difference is that unlike Gill’s figures, Stevens’s are unaffected by whatever intrinsic differences there may have between McCourt’s pricing practices and those of Roads. I do not believe it is a coincidence that the difference between Stevens’s and Gill’s bottom lines is very nearly the difference between McCourt’s and Roads’ bids in 2004; rather, I believe that the million-dollar difference reflects the manner in which the two contractors priced the same work.[33]
118. I also find Stevens’s computation of the “extended general conditions” cost (the direct cost of maintaining the site and crew during the period of delay) to be somewhat more comprehensive, and better reflective of this aspect of XL’s delay damages, than Gill’s “unabsorbed field management costs” figure. The justification of the 10% markup was never explained, however, so I find it to be unproven as an item of damages.
119. The recoverability of the Carrara & Sons claim for storage costs is also a legal issue, discussed in the Conclusions of Law; for the reasons given there, I have not included it as an item of damages. I do find, however, that Stevens correctly reported the amount of the Carrara claim at the time of his analysis.
120. With the corrections applied in the Conclusions of Law (and understanding that any feasible analysis of this subject is necessarily an approximation), Stevens’s analysis reflects the full and fair amount of damages that XL incurred as a proximate result of the 749 days of delay in completing the temporary utility relocation work.
I. Other Asserted Causes of Delay.
121. MassDOT has pointed to several instances of what it characterizes as concurrent delay, obviating any claim to recovery under section 8.05 of the Standard Specifications (second paragraph, last sentence).[34]
1. Utility Work.
122. One such instance pertains to the utilities’— especially, NStar Electric’s—dawdling in starting, performing, and completing the utility relocation work once the pertinent force account agreements were in place; this, MassDOT says, resulted in concurrent delays from the date the NStar Electric force account agreement issued (July 20, 2005) until the utility relocation work was completed on March 28, 2007.
123. As noted already, however, MassHighway’s form of force account agreement did not impose a deadline or schedule for the utility relocation work that was so vital to this project getting started; instead, it used a one-schedule-fits-all approach in which the utilities were not obligated to complete their work until years after the project itself was to have been completed. NStar Electric, especially, took full advantage of the opening that MassHighway granted it. The slow pace of the utility work was simply another byproduct of MassHighway’s failure in its duty to coordinate and administer the project.
2. Roads’ Default.
124. Another such instance pertains to Roads’ failure and the necessity of re-bidding the project and of Bridges, then McCourt, readying themselves for the work.
125. MassHighway therefore claims the period from March 23, 2006 (the date Roads defaulted) until April 2, 2007 (the day McCourt began work) as concurrent delay.
126. On this issue, it is not apparent that Roads’ failure would have resulted in any delay—certainly, not more than a few weeks—had the project not been stalled already over the utility relocation issue. When Roads was unable to proceed, XL brought Bridges in. XL later realized that it had the leisure to bring in a more substantial contractor—which ended up being McCourt—and it re-bid, re-contracted, and re-commenced the project according to a schedule quite obviously tailored to an educated—and, as events *160 would prove, very accurate—prognostication of when the utility relocation work would be completed. There is no evidence that Bridges would have been unable to complete the project if necessary, or to keep it going on an interim basis even if another contractor were ultimately brought in.
3. Rizzo’s Delayed Processing of Submittals.
127. As a third proffered cause of concurrent delay, MassDOT points to a time early in the project when Rizzo Associates ceased, for a while, the job of reviewing shop drawings submitted by Roads.
128. As noted above, the Chief Engineer of MassH-ighway or his “authorized representative” had responsibility over various issues of the sort that arise on any significant construction project, including the approval of shop drawings.[35] On this project, however, the City of Waltham did the design work through the firm of Rizzo Associates, which thus became the sub-delegee (through the City) of MassHighway’s Chief Engineer. Among Rizzo’s responsibilities (sometimes, with assistance from Edwards & Kelcey) was the review and approval of shop drawings prepared by Roads or its subcontractors.
129. This organizational structure proved problematic when, early in the project’s life (March 2, 2005), Rizzo notified the City that it and Edwards & Kelsey had paid themselves out of funds allocated to the construction phase in their design work. The Mayor’s response was to instruct the City’s Transportation Director to tell Rizzo “not to spend money they don’t have. It’s against the law!!!!!” This translated into the Department’s instruction, on March 8, that Rizzo “cease all work immediately.” Rizzo did, -for four months. (Ex. 186-88.)
130. This meant that shop drawings that Roads submitted pertaining to the drilled shafts went un-reviewed. Finally, the Mayor submitted and the City Council approved a request for supplemental funding; Rizzo got back to work; and the drilled shaft shop drawings were forwarded to MassHighway for its final approval on July 18. (Ex. 714.)
131. MassHighway therefore claims the period from March 8, 2005 to July 18, 2005 as concurrent delay on account of the submittal issue. The argument overlooks the fact that the delay was caused by an interruption in the Engineer’s—i.e., MassHighway’s— own work.
4. Approval of Pile Driving Subcontractor.
132. Also on July 18, 2005, MassHighway approved Roads’ selection of Northeast Pile Driving as the subcontractor to perform the work. Roads had submitted the request for approval, with supporting documentation, on July 14. (Ex. 250.)
133. There is little direct evidence concerning the reason(s) the approval process was not initiated earlier. Roads executed the subcontract with Northeast Pile Driving, including a scope of work and price schedule, on February 11, 2005. Northeast executed it on July 7, 2005. The rest of the paperwork—a list of projects Northeast had completed, request for taxpayer identification number, and certificates of insurance (liability and workers’ compensation) and of non-segregated facilities and nondiscrimination—was entirely proforma, but is also dated in July.
134.The inference is compelling, and I find, that neither Roads nor Northeast was in a hurry to complete the paperwork for a job that both knew, before February 11, was going nowhere fast. Had the utility relocation been cued up to start, I have no doubt that Roads and Northeast would have taken care of their business right away. In any event, the paperwork and the approval were in place before MassHighway issued the first utility force account agreement on July 20, 2005. Had the project not been hung up on account of the force account agreements, Northeast would have been approved and performing as soon as the site was ready for it.
CONCLUSIONS OF LAW
To XL, this is a straightforward case: MassHighway was responsible for relocation of the utility poles and wires so that Roads could begin work. It failed to accomplish this; worse, it ordered Roads to mobilize and begin work without telling it the site was not yet ready, then turned its back on its responsibility for . administering and coordinating the utilities’ work. The result was very substantial delay, which caused Roads and ultimately, XL to incur very substantial costs, all without fault on their part. For this, XL says, it is entitled to compensation—under the contract, or outside it—for the increased project costs attributable to the delay.
MassDOT, while conceding that the delay was caused by the utility relocation work and that Roads and XL were free of fault, reaches a different conclusion. Armed with various provisions in the Standard Specifications, it maintains that XL is barred from recovery because:
1. XL failed to present a claim for its actual monetary damages exclusive of overhead and profit, as required by Subsection 8.05;
2. Under Subsection 5.05, MassHighway is not liable for “any delay which may be due to or result from . . . work of Public Service Corporations” (i.e., public utilities);
3. Under Subsection 8.05—the exclusive avenue for a price adjustment on account of delay—"No adjustment shall be made if the performance by the Contractor would have been prevented by other causes even if the work had not been so suspended, delayed or interrupted by the Department"; the concurrent causes of delay discussed above therefore stand in the way of a damage award in this case; and
*161 4. XL’s claim also included storage and related claims by J.P. Carrara to which Carrara is not entitled under its subcontract, and which therefore are not a cost incurred by Roads or XL on account of delay.
A. Basic Principles.
“When the contract makes provision for equitable adjustment of particular claims, such claims may be regarded as converted from breach of contract claims to claims for relief under the contract.” Sutton Corp. v. Metropolitan Dist. Comm’n, 423 Mass. 200, 213 n.22 (1996), quoting United States v. Utah Constr. & Mining Co., 384 U.S. 394, 404-05 n.6 (1966). In a claim for damages on account of delay, therefore, the monetary remedy of first resort—and in most cases, the only resort—is an equitable adjustment under section 8.05 of the Standard Specifications.
A no-damages-for-delay provision in a public construction contract is valid and is usually enforceable, even where the agency’s actions causing the delay “were ‘negligent, unreasonable or due to indecision.’ ” Wes-Julian Constr. Corp. v. Commonwealth, 351 Mass. 588, 595 (1967). It follows that a contract provision that allows delay damages, but places conditions and limitations on them, is generally enforceable as well. See Reynolds Bros. v. Commonwealth 412 Mass. 1, 7-8 (1992).
Very occasionally and in extraordinary circumstances, however, a claim may be considered not under, but as a breach of, the contract, in which case the awarding authority may not avail itself of contractual limitations on what would otherwise be recoverable delay damages.
What follows is an analysis, first, of XL’s entitlement to an equitable adjustment in price under the contract terms; then, of the theories it has asserted for recovery of damages outside the contract.[36]
B. Equitable Adjustment Within the Contract.
The following analysis assumes that the parties are bound by the contractual limitations on recovery for delay damages.
1. Sufficiency of the Claim Letter.
Section 8.05 requires that the contractor submit a written claim “not later than 30 days after the termination of [the] suspension, delay or interruption,” detailing “the amount of the claim and breakdown of how the amount was computed in accordance with Subsection 9.03B except no allowance for overhead and profit shall be allowed.” The method of computation specified by section 9.03B, before excision of overhead and profit, is as follows:
[T]he sum of (1) the estimated cost of direct labor, materials, and the use of equipment, plus 10 percent of this total for overhead: (2) plus the actual cost of Workmen’s Compensation and Liability Insurance, Health, Welfare and Pension benefits, Social Security deductions, Employment Security Benefits, and such additional fringe benefits which the Contractor is required to pay as a result of Union Labor Agreements and/or is required by authorized government agencies: (3) plus 10 percent of the total of (1) and (2); (4) plus the estimated proportionate cost of surety bonds.
Section 9.03B deals with compensation of a contractor for extra work for which the contract does not specify a unit price. By editing out the two “10 percent” clauses, however, one has the formula for compensating a contractor for damages caused by the awarding authority’s delay.
In this case, there can be no dispute that XL submitted a written claim for equitable adjustment on account of delay, within 30 days after its termination. Although MassDOT asserts in its brief that the Standard Specifications’ notice and claim provisions are “strictly construed” (i.e., construed against contractors), none of the cases it cites for this proposition[37]— all of which deal with a contractor’s utter failure to provide a required notice or a written claim, or to obtain a statutorily required approval from the Commonwealth—uses this language, or suggest that the content of a timely written claim, filed in good faith and using the information then at hand, should be judged by anything other than a rule of reason. See Sutton, 423 Mass, at 208 (where contractor submitted timely notice of claim, and awarding authority “was aware throughout the project of [contractor’s] additional expense” and there was no evidence that it was “prejudiced in any way by the lack of an itemized statement of damages,” notice of claim was sufficient); Farina Bros. Co., Inc. v. Commonwealth, 357 Mass. 131, 139-40 (1970).
XL’s April 27, 2007 claim may not have strictly adhered to the computation method specified in Section 9.03B; at least, it was not so broken out. That method requires adaptation, however, before it can be a reasonable—or even a feasible—formula for valuing a claim by a surety for either extra work or delay damages, where the contractor has defaulted. The surety stands in the legal shoes of the general contractor, but can do none of the work itself; it must of necessity contract all of it out to a firm that is legally its subcontractor, but actually functions as a substituted general contractor. The new firm (here, McCourt) has no direct contractual relationship with the awarding authority. It cannot be compelled to forego its overhead or its profit on the job, or even that portion of it attributable to increased costs due to delay, and even calculating this amount would be a difficult and necessarily imprecise endeavor.
The express provisions of the Takeover Agreement, however, entitle XL to “all sums due and payable for services and materials furnished toward the Completion Work, as would have been payable to the Bond Principal if there had been no default”—no more, and *162 no less. If its effort in the claim letter to set out and support the amounts that Roads would have been entitled to, had it survived and completed the job, was imperfect, this was due in large part to the inherent limitations of the exercise. These include the facts that the great majority of the work was still to be done, and that its own records would not have provided a breakdown of the items included in section 9.03B or of the delay-induced increase in overhead and profit that the section excludes. The April 27, 2007 claim letter was a reasonable effort, albeit one which might be improved with the passage of time, further information, and further analysis.
This, in fact, is how MassHighway viewed and treated it at the time. Patricia Leavenworth’s response on June 21, 2007, for example, did not reject the claim; nor did MassHighway so much as hint—then, or ever—that it needed a breakout of McCourt’s cost of direct labor, materials, equipment usage, insurance, employee benefits, overhead, and/or profit. Instead, Leavenworth requested such items as Roads’ job schedules and updates, its bids and cost accounting records, invoices, shop drawings, correspondence and notices, and other information concerning the delay and Roads’ efforts to mitigate. XL responded with another package with the requested material.
Discussions continued, and for the next two years District 4 was reporting to Ten Park Plaza that it was “negotiating” the claim, and there is no evidence that it ever told XL that the notice of claim needed to be itemized any further or differently than it had been. MassHighway neither allowed it nor rejected the claim on this or any other ground. MassDOT’s present objection that XL’s submissions did not comply with Section 9.03B was waived, at least five years ago.
2. Delay Due to Work of Public Service Corporations.
As detailed above, MassHighway (through the Chief Engineer) had authority for all decisions “relating to the supervision, control and direction of all work on the site and the use thereof.” (Ex. 1C, sec. 1.19, 5.01.) Roads was to “so carry on [its] work under the direction of the Chief Engineer that [utilities] may enter on the work to make changes in their structures . . . without interference . . .” {Id., sec. 5.05.) With authority, of course, comes responsibility, and also—under general principles of construction law—liability, where the owner or its agent has failed to present the contractor with a construction-ready site and/or to coordinate the project thereafter, so as to cause disruption and delay in the contractor’s work. Findlen v. Winchendon Hous. Auth., 28 Mass.App.Ct. 977, 978 (1990).
General principles, however, must sometimes yield to specific contract provisions. Section 5.05 of the Standard Specifications bars compensation for “delay which may be due to or result from . . . work of Public Service Corporations or Municipal Departments.” So far as appears, no reported case has interpreted this language, but it is at least clear that a “public service corporation” is, in more contemporary parlance, a public utility. See, e.g., Save the Bay, Inc. v. Department of Pub. Utils., 366 Mass. 667, 680 (1975). There does not appear to be any dispute that NStar and the other companies with wires on its poles (as well as KeySpan, the successor to Boston Gas) were all “public service corporations” as the term is used in the Standard Specifications.
MassDOT therefore maintains that delays attributable to utility relocation work are by definition “due to or resulting from . . . work.of Public Service Corporations.” XL responds that in this case, the delay damages “were proximately caused by MassDOT’s premature issuance of the [Notice to Proceed], and by the failure of MassDOT to properly schedule, coordinate and manage the utility work, including its failure to include in the force account agreements any terms and conditions regarding relocation, scope of work, schedule, duration of performance or cost of the work,” and ought not to be excluded by section 5.05.
XL’s argument is not without its appeal. The utility-related delays in this case were surely extraordinary, in their duration, in their effect on the project and its general contractor, and in the culpability of the awarding authority in all of the respects identified by XL. “In the absence of a specific contract provision to the contrary, [MassHighway] would be bound to refrain from causing delay in the [contractor’s] commencement or performance of the contract, and the [contractor] could recover for breach of contract for such delays.” Wes-Julian Constr. Corp. v. Commonwealth, 351 Mass. 588, 594 (1967), citing Charles I. Hosmer, Inc. v. Commonwealth, 302 Mass. 495, 502 (1939); Morgan v. Town of Burlington, 316 Mass. 413, 417 (1944).
In this case as in Wes-Julian, however, there is “a specific contract provision to the contrary.” The language of section 5.05—"no claim for, or on account of any delay which may be due to or result from .. . work of Public Service Corporations"—is clear and unequivocal on its face; much more so, in fact, than the concurrent delay provision which I have found does not apply to the utilities’ tardy relocation efforts.
As soon as NStar Electric’s force account agreement was in place on July 20, 2005, it was able to (though it did not) proceed with its work.[38] Standing alone, the facts that MassHighway thereafter did precious little to light a fire in NStar’s belly, and that its lack of leverage with which to accomplish this was due in large part to the ill-considered terms of the force account agreements which it had drafted, would mean only that its actions were “negligent, unreasonable or due to indecision.” I would hold, therefore—assuming the enforceability of this and the contract’s other limitations on delay damages—that any period during which the project was held up behind the work of a *163 utility which had a force account agreement in place would be non-compensable under section 5.05.
The initial period of delay, by contrast—from March 8, 2005 to July 20, 2005—cannot be charged to the work of the utilities, because none had yet been authorized by MassHighway to do any work. Assuming that XL is limited to recovery under the contract, therefore, it would recover delay damages for, but only for, the period March 8 to July 20, 2005, when no public service corporation had yet been authorized to commence work.[39]
3. Concurrent Delay.
Under section 8.05, para, second of the Standard Specifications, “No adjustment [for delay] shall be made if the performance by the Contractor would have been prevented by other causes even if the work had not been so suspended, delayed, or interrupted by the Department.”
MassDOT argues that this clause covers the entire period of delay, from March 8, 2005 through March 28, 2007, except for the period between July 14, 2004, when Roads submitted the paperwork to MassH-ighway for approval of Northeast Pile Driving, and July 20, 2004, when MassHighway issued the NStar Electric force account agreement. Before then, it says, the project was being delayed concurrently by Rizzo Associates’ failure to review shop drawings submitted by Roads for early critical path work (the drilled shafts) and by Roads’ tardiness in submitting the Northeast Pile Driving paperwork, which was needed for even earlier critical path work (the temporary earth supports).[40]
Rizzo’s delay in reviewing the shop drawings is irrelevant to XL’s claim. As detailed above in the Findings, Rizzo was doing the work of the Chief Engineer of MassHighway, including review and approval of shop drawings, and specifically those for the drilled shafts. In this respect, “the architect was the agent of the defendant, and . . . the latter was liable for [the architect’s] unreasonable delay.” Morgan v. Burlington, 316 Mass, at 417. Rizzo’s work stoppage and the resultingly tardy shop drawing approvals—which no one blames on any act or omission by Roads—therefore cannot be counted as “other causes” of delay, so as to excuse MassHighway’s dilatoriness in tending to the utility relocations.
Nor does the late application and approval of Northeast Pile Driving count as a concurrent delay under section 8.05. The express language of that section’s relevant sentence—"if the performance by the Contractor would have been prevented by other causes even if the work had not been so suspended, delayed, or interrupted by the Department"—requires a finding of causation. As detailed in the Findings, there was no apparent reason for Roads and Northeast to hurry the paperwork on a project that was stalled by MassHighway’s own inattention to the paperwork needed to start the utility relocation. By the time MassHighway issued the first force account agreement, Northeast’s paperwork had been submitted and its approval granted—but its services would not be required for another 20 months. Had the NStar Electric force account agreement been in place earlier and the work ready to begin, Roads and Northeast would have been ready to start the pile driving for the temporary earth supports.
The period of delay from March 8 to July 20, 2005 is therefore unexcused on grounds of concurrent delay.
4. Computation of Equitable Adjustment.
The evidence would not permit a precise computation of XL’s damages for the period March 8-July 20, 2005 (134 days). I have computed XL’s damages, with reasonable approximation, for the full 749-day delay as claimed, in section C.5, infra. They are: $592,249 for extended general conditions (the contractor’s cost of keeping the site open) plus $3,261,204 in cost escalation, for a total of $3,853,453.
Bearing in mind that damages need not be proved with mathematical precision so long as they are grounded in the evidence, it seems appropriate, if damages were to be awarded only for the initial 134-day delay, to pro-rate the entire damages, after first deducting from the cost escalation figure a reasonable estimate of the contractor’s profit on this item. I estimate the profit margin at 10%, reducing the cost escalation figure to $2,935,084, for total damages net of profit of $3,527,333 (that is, $592,249 for extended general conditions plus $2,935,084 for cost escalation). 134 days divided by 754 (Stevens’s figure) is 0.1777188328912467. Damages for 134 days, net of profit, would therefore be $626,874 (that is, $3,527,333 multiplied by 0.1777188328912467).
C. Extra-Contractual Theories of Recovery.
The Standard Specifications for public works contracts impose significant procedural and substantive limitations on equitable adjustments for delay claims. Unsurprisingly, therefore, contractors have often advanced—and courts have occasionally been receptive to—various theories of recovery outside the strictures of the Blue Book.
In this case XL, in addition to arguing that it is entitled to an equitable adjustment under the contract,[41] suggests three extra-contractual theories of recovery.
1. G.L.c. 30, 390.
Chapter 30, section 390 of the General Laws provides that public works contracts subject to the procurement requirements of section 39M contain the following provision:
The awarding authority may order the general contractor in writing to suspend, delay, or interrupt all or any part of the work for such period of time as it *164 may determine to be appropriate for the convenience of the awarding authority; provided however, that if there is a suspension, delay or interruption for fifteen days or more or due to a failure of the awarding authority to act within the time specified in this contract, the awarding authority shall make an adjustment in the contract price for any increase in the cost of performance of this contract but shall not include any profit to the general contractor on such increase; and provided further, that the awarding authority shall not make any adjustment in the contract price under this provision for any suspension, delay, interruption or failure to act to the extent that such is due to any cause for which this contract provides for an equitable adjustment of the contract price under any other contract provisions.
Although it is “far from a model of clariiy,” section 390 has been construed so as to make the second (“provided however”) clause dependent on the first, such that there is a right to adjustment only when the agency has “order[ed] in writing a suspension, delay, or interruption of [the contractor’s] performance.” Reynolds Bros., 412 Mass, at 6. There was no such order here, and section 390 therefore affords XL no relief.
2. ‘True Breach.”
The SJC has most recently summarized the “true breach” doctrine thus:
“When the contract makes provision for equitable adjustment of particular claims, such claims may be regarded as converted from breach of contract claims to claims for relief under the contract.” Recovery for such claims is limited to the remedies provided in the contract. When a particular claim falls outside the contract, such that it is not redressable under specific contract adjustment provisions, it is a “true” breach of contract claim that may justify an award of damages.
Sutton, 423 Mass, at 213 & n.22 (holding that MDC’s rejection of equitable adjustment claim was not a “true breach”) (citation omitted).
This is not such a case; as in Sutton, XL’s claim for compensation for delay is within, albeit circumscribed by, the contract. The fact that some'delay claims may not qualify, under the contract terms, for monetary relief does not, standing alone, take those claims “outside the contract.”
3. Farina Brothers.
Finally, XL invokes the doctrine of Farina Bros. Co. v. Commonwealth, 357 Mass. 131 (1970), under which the awarding authority’s abuse of its own contractual obligations may be so pronounced that it forfeits its right to rely on the special protections of the Special Conditions. Here, I find, XL has hit the mark.
Farina Bros, concerned a $5.25 million contract with the Massachusetts Department of Public Works to “lower[ ] the level of the roadbed of the Boston and Main Railroad on Canal Street so that trains would run below the level of the street and through a tunnel under Washington Street in Salem, thereby eliminating grade crossings.”[42] It was “a highly complex undertaking requiring a high degree of coordination between all parties.” 357 Mass, at 138. The project’s Chief Construction Engineer abdicated from all such coordination, at one point informing the contractor that “he didn’t care about what was happening and would do nothing to carry out the obligations of the Department.” The same Engineer refused to allow the contractor’s requests for extension of time, “or to shut down the work . . . when it was prevented from going forward with excavation of the tunnel structure by the failure of the railroad to relocate tracks or reschedule it when such a move became necessary to conform to changed conditions.” Id.
In the view of the SJC:
The entire record discloses a cavalier treatment of the contractor by the Commonwealth which seems to have rested secure during the period in question on the contract provisions relative to delay and extension.
****
In circumstances such as here appear, . . . the Commonwealth in effect has used the delay provisions to whipsaw the contractor. So employed, they cannot absolve the Commonwealth of liability. If, as may be the case, delay is to occur during performance of the contract the collateral provisions relating to appropriate extensions should come promptly into play. In the present instance their application was unconscionably delayed in a manner to deprive the contractor of such protections as the Blue Book afforded to it. Adherence to these standards by both parties is required. The evidence supports the conclusion that agents of the Commonwealth by intentionally obstructing the application of those standards caused damage to the contractor. The trial judge correctly concluded “that the refusal of the Commonwealth to grant an extension of time or to reschedule the work when the railroad did not relocate its tracks within the time contemplated is a breach by the Commonwealth of the contract terms entitling the * * * (contractor) to damages.”
****
. . . The damage here did not arise from the Commonwealth’s exercise of the privilege of delay or changing the time of performance but from the complete failure of its agents promptly to afford to the contractor the protection of extensions and the opportunity to reschedule its work during performance.
*165 [[Image here]]
In sum, we hold that the Commonwealth cannot hide behind the specifications of its contract dealing with delay and, in the circumstances of this case, deny recovery to a contractor who has been put upon to the extent here shown. We have dealt not with the question of damages caused by delay itself . . . We have dealt rather with damages caused the contractor by failure to grant seasonable extensions for performance made necessary by delay and failure of the Commonwealth to assist the contractor properly in rescheduling work. It remains only to say that the Commonwealth cannot expect unfailing and honest performance by contractors when it administers its contracts as this one appears to have been administered.
Id. at 138-40. The court distinguished “the Wes-Julian case where it was not shown that, if delays occurred, the contractor was not promptly granted extensions to which his contract entitled him.” id. at 138.
The present case is strikingly reminiscent of the facts in Farina Bros.: the project required attentive coordination of the work of those whom only MassH-ighway could control {the utilities); MassHighway was extraordinarily neglectful of its obligations in this regard; it rejected Roads’ request to save costs by “mothballing” the project when it was clear the delay would be of long duration, insisting instead that Roads maintain a crew on the site for appearances’ sake; and it dealt in bad faith with XL’s plainly meritorious request for an extension of time, allowing it in small increments, always late, knowing full well of XL’s full entitlement but holding back in order to enhance its position in negotiating the claim for monetary relief. With the addition of a loutish project engineer (there was no character like him on the Winter Street project), the Winter Street project would be Farina Bros. Redux.
A careful reader of the Massachusetts Reports may fairly wonder about Farina Bros.’ continuing prece-dential value. The case was periodically cited and distinguished for the first twenty years; see Gil-Bern Constr. Co. v. Medford, 357 Mass. 620, 623 (1970); St. Germain & Son, Inc. v. Taunton Redevelopment Auth., 4 Mass.App.Ct. 46, 52-53 (1976); Joseph E. Bennett Co. v. Commonwealth, 21 Mass.App.Ct. 321, 330 (1985); B.J. Harland Elec. Co. v. Granger Bros., 24 Mass.App.Ct. 506, 511 (1987); Findlen v. Winchendon Hous. Auth., 28 Mass.App.Ct. 977, 978 (1990);[43] and has not been cited in an appellate decision in the twenty-two years since. Perhaps this is because the absolute no-damages-for-delay clause in the 1953 edition of the Standard Specifications that governed the Salem project (see 357 Mass. at 132-33, 135-36 & nn. 1-3) has given way to the qualified clause applicable to this case, thus alleviating to a significant degree the damage that such delays can inflict on a contractor, and lessening the need for extraordinary relief.
That said, Farina Bros, still stands for the commonsense and eminently fair proposition that a parly may not turn its back on its contractual obligations—at least, not to the extent seen in that case and in this one—and seek shelter in its contractual defenses. It has not been overruled, and MassHighway’s disregard of its obligations in this case has been just as great as in that one, and even more catastrophic for the contractor in relation to the scale of the project.
There is also the fact that in Farina Bros, the contractor’s claim was for a period of several months, after it “had deployed its labor, equipment and materials” only to wait while the Department completed necessary land takings and the B&M to relocate its tracks, with the Department refusing its requests to shut down the jobsite in the meantime. The damages from the delay and the refusal were essentially the same, permitting the court to affirm the award while eschewing any suggestion that it was countenancing an award of “damages caused by delay itself.” In this case, by contrast, the lion’s share of XL’s claim—the cost escalation component—is attributable strictly to the passage of time, not to MassHighway’s refusal of its request to “mothball” the site.[44] Farina Bros, might be distinguished on this ground.
MassHighway’s arbitrary and capricious conduct, however, neither began nor ended with its insistence that XL keep a crew on site even though there was little to do. At the very beginning, it put the project out to bid, contracted with Roads, ordered it to commence work within ten days, and accepted without comment its schedule that had the utility relocation work completed in the next two months, knowing all the while what Roads did not: that the utility relocation work was nowhere near ready to begin; indeed, was not yet even under contract. When, more than two years later, it came time to deal with XL’s resulting claims, Mass-Highway flouted its obligation to deal “promptly” (Farina Bros., 357 Mass, at 139) and “in good faith” (Sutton, 423 Mass, at 205) with the request for extension of time, hoping instead to gain traction on the monetary claim.
From the outset, in other words, MassHighway willfully disregarded that most basic and time-honored of owners’ obligations: to provide the contractor with a site that is ready for the work he has contracted to do, and then to permit him to do it without hindrance. See Zarthar v. Saliba, 282 Mass. 558, 561 (1933); Blanchard v. Blackstone, 102 Mass. 343, 347 (1869). Had it acted responsibly and in good faith, all that followed could have been avoided. Assuming (as I do) that Farina Bros, is still the law of the Commonwealth, XL is entitled to relief in the full amount of the actual damages it incurred when MassHighway turned its back on its contractual obligations.
5. Computation of Damages.
The Takeover Agreement obligated XL to complete the project, and MassHighway to pay XL what “would *166 have been payable to the Bond Principal [Roads] if there had been no default.” (Ex. 61, ¶5.) This accords with the basic rule that “the surely stands in the shoes of’ the principal (i.e., the contractor). M.J. Flaherty Co. v. United States Fid. &Guar. Co., 61 Mass.App.Ct. 337, 339 (2004); see Nat’l ShawmutBank of Boston v. New AmsterdamCas. Co., 411 F.2d 843, 844 (1st Cir.1969) (“[w]hen on the default of the contractor, it pays all the bills of the job to date and completes the job, it stands in the shoes of the contractor insofar as there are receivables due it”). This means, among other things, that if McCourt’s pricing was, for reasons not attributable to the delay, more expensive than Roads’, XL must absorb the difference as part of the risk that it insured when it wrote the performance bond. XL cannot, in other words, expect to be paid more than Roads would have been entitled to, had it survived.
I have found that Glen Stevens’s computations provide a reasonably accurate reflection of the actual damages caused by the 749 days of culpable delay; more so than Kevin Gill’s earlier analysis. “Although mere speculation is insufficient, the amount of damages need not be proved with mathematical precision.” Coady v. Weltfleet Marine Corp., 62 MassApp.Ct 237, 245 (2004). Indeed, this is a rule of necessity in many business and contract cases, where “ [t]he amount of damages seldom can be proved with the exactness of mathematical demonstration. Much must be left to estimate and judgment, sometimes upon meager evidence.” Agoos Leather Co., Inc., v. American & Foreign Ins. Co., 342 Mass. 603, 608 (1961) (internal quotations omitted). Stevens’s analysis more than meets this standard, and represents the most reliable assessment of XL’s damages that is feasible in the circumstances.
There remains the issue of whether Carrara’s claim for storage of the bulb tees is an appropriate item of XL’s damages. I do not believe that it is. Roads’ contract with Carrara has an absolute no-damages-for-delay clause. If Carrara had the right to demand storage fees in addition to the purchase price as a condition of delivering the bulb tees, it was as a result of Roads’ default, which is a risk that XL assumed when it wrote the payment bond.[45] I have therefore excluded Carrara’s claim from the damages assessed against MassHighway.
I have also excluded the 10% markup that Stevens applied to the “extended general conditions” portion of XL’s damages, as unexplained and therefore unproven as an item of actual damages.
I therefore assess damages on the extra-contractual theoiy of recovery as follows:
Extended General Conditions $ 592,249
Cost Escalation $3,261,204
Offsite Storage $_Q
Total Additional Cost $3,853,453
ORDER FOR JUDGMENT
For the foregoing reasons, judgment shall enter in favor of the plaintiff on Count I of the Complaint, in the principal amount of $3,853,453, with prejudgment interest to run from April 27, 2007 and computed according to G.L.c. 231, §61.
APPENDIX A
CHRONOLOGY OF CERTAIN EVENTS IN TEMPORARY UTILITY RELOCATION
Date Event
12/13/04 Notice to Proceed
3/8/05 Original scheduled date for completion of NStar Electric relocation
7/15/05 KeySpan Force Account Agreement issued
7/20/05 NStar Electric Force Account Agreement Issued
9/23/05 Nstar Electric starts work
9/28/05 KeySpan starts work
10/20/05 KeySpan completes work
12/21/05 Verizon Force Account Agreement Issued
1/18/06 Verizon starts work
2/22/06 MCI-Worldcom Force Account Agreement issued
2/23/06 NStar Communications Force Account Agreement issued
3/28/06 MCI-Worldcom starts work
3/1/06 Comcast Force Account Agreement issued
7/10/06 Comcast starts work
9/6/06 NStar Communications starts work
9/18/06 Verizon completes work
9/22/06 NStar Electric completes work
10/16/06 RCN begins work
11/1/06 AT&T Force Account Agreement issued
11/9/06 AT&T starts work
12/1/06 Nstar Communications completes work
3/5/07 RCN completes work
3/23/07 MCI-Worldcom completes work
3/27/07 City of Waltham relocates its electric wires
3/28/07 Comcast completes work; AT&T completes work
APPENDIX B
CHRONOLOGY OF TIME EXTENSIONS ALLOWED BY MASSHIGHWAY THROUGH 12/31/09
Date Ex. Action
4/27/07 102 XL requests extension of 961 days, 11/10/07 to 6/28/10.
9/10/07 106,107, 249 Interoffice Memos: Dist. 4 recommends 944 days in response to 4/27/07 request.
11/15/07 108, 634 Interoffice Memo: Dist. 4 requests scaled-back interim extension of 142 days.
1/2/08 109, 248 Contract Modification: 142 days, 11/10/07 to 3/31/08.
3/7/08 247 Interoffice Memo: Dist. 4 recommends interim extension of 62 days, to 5/31/08.
4/16/08 111,246 Contract Modification: 61 days, 3/31/08 to 5/31/08.
5/20/08 114 Interoffice Memo: Dist. 4 requests interim extension of 92 days, to 8/31/08.
7/16/08 246 Contract Modification: 92 days, 5/31/08 to 8/31/08.
10/6/08 116, 245 Interoffice memo: Dist. 4 recommends 212 days, to 3/31/09.
????? See 244 Contract Modification: 92 days, 212 days, to 3/31/09.
3/10/09 244 Interoffice Memorandum: Dist. 4 recommends 275 days, to 12/31/09.
4/22/09 243 Contract Modification: 275 days, 3/31/09 to 12/31/09.

English nursery rhyme, thought to refer to the unhorsing and resulting death of Richard III at the battle of Bosworth Field, by which Henry Tudor (Henry VII) ascended the throne.

For the most part, I have included record citations to exhibits but not to testimony. Although the documentaiy record is extensive and revealing, the testimony (some of which is recounted herein), and my assessments of its credibility, are also central to the findings.

I take judicial notice of the fact that Winter Street is the primary access to a large developed area of Waltham west of 1-95, with substantial retail (Home Depot, Costco, and smaller stores and restaurants), service, and professional facilities (including a hotel, Mass. General West and many medical practices, law firms and other professionals, and a very large Boston Sports Clubs facility (at which the Boston Celtics stay in shape and mere mortals try to)), as well as corporate office facilities (including Raytheon's global headquarters, the massive Bay Colony Corporate Center, and many others). Traffic is heavy, at nearly all hours. The only other two-way access to the area is via Bear Hill Road or Lexington Street, both narrow, meandering, two-lane country roads heading south. Winter Street itself continues westerly into Lincoln but is similar to the others in width and configuration, and has a one-way section to discourage through traffic.

See Wes-Julian. Constr. Corp. v. Commonwealth, 351 Mass. 588, 590 (1967).

Subsection 9.03B limits payment for extra work, where there is no agreed price, to the following:
(1) the actual cost for direct labor, material (less value of salvage, if any) and use of equipment, plus ten percent of this total for overhead: (2) plus actual cost of Workmen’s Compensation and Liability Insurance, Health, Welfare and Pension benefits, Social Securiiy deductions, and Employment Security Benefits: (3) plus 10 percent of the total of (1) and (2); (4) plus the estimated proportionate cost of surety bonds.

The temporary earth supports required driven steel piles, and the abutments and piers were to rest on concrete supports poured into shafts drilled into the ground (the “drilled shafts”). Both the pile driver and the drilling rig are hung from a crane.

Entering into force account agreements and coordinating with the utilities was not within Roads’ contractual scope of work, meaning that it remained MassHighway’s responsibility.

The removals by the other utilities were not shown as separate tasks, but the construction of the Phase I bridge, including the final installation of utilities under it, were shown as complete by December 2005.

Ex. 321, 350, 365, 380, 386, 393, 406, 408, 409, 460. MassDOT has pointed to additional entries (Ex. 316, 318, 319, 320, 331, 356, 394, 398, 467, and 469 as “Evidence of the More than 20 Days MassDOT Contacted NStar Electric to Work.” (Ex. J for identification.) With one exception, however, these entries say nothing about schedule or the resumption of work, or else they concern NStar Communications, not NStar Electric. The sole exception is Ex. 398 (May 24, 2006), in which Mr. McDevitt volunteered that “possibly next week a subcontractor would be in.” (As should, by this time, have surprised no one, it didn’t happen.) (Ex. 399-402.)

McDevitt, who had been involved at least since Rizzo’s August 2004 meeting with utility representatives, was MassHighway’s main point of contact with NStar Electric on the relocation issue.
Hayden testified that he communicated with NStar Electric more often than is shown in his project diaiy. This may be so, but I do not credit the suggestion, if it was intended, that he would not have diaried all communications of substance concerning this, the most Important issue on the project during this period.

See Ex. 269, 294-305, 306-14, 341-43, 345-47, 353, 374-79, 382, 385, 387, 388, 433-36, 438,440, 441, 443, 448-52, 456-59, 474, 512, and 518.

There is one date missing, inasmuch as RCN’s force account agreement is not among the exhibits.

This schedule (Ex. 43) assumed that NStar Electric would begin its relocation work by October 4, 2005 and finish it by January 10, 2006. In the event, NStar Electric started a week and a half earlier and finished eight and a half months later than in these revised assumptions.

Although the lack of work—and, therefore, of progress payments—on the Winter Street cannot have helped its finances, Roads had many other projects going at the same time. No one at trial explicitly blamed its failure on this one.

Bridges had an affiliation—some commonality of management and/or ownership—with Roads. Although the precise nature of the relationship was never explained in the evidence, whatever it was presumably made Bridges a convenient candidate to pick up where Roads had left off.

XL treated the bids as sealed, such that no bidder was tipped off to the bid of any other.

There were evidently more delays later in the project, some apparently due to the work of moving the utilities from their temporary to their final location (see next footnote). There was little evidence concerning delays after March 28, 2007, and XL makes no claim relating to them.

The largest of these was pursuant to an extra work order in the amount of $1,365,183.43, approved in October 2009, for altering the then-remaining demolition and construction work to enable Verizon to move, rather than cut and re-splice, its 60,000 pairs of copper wires to their final location under the new bridge, saving $720,000 and reducing the anticipated time for this work from eighteen months to eight months. (Ex. 118) This issue was unrelated to the temporary relocation work that is the subject of this case.

Because the bulb tees (part of the lump sum portion) had been excluded from McCourt’s bid, XL’s calculation added this item to the amount of the McCourt bid “to ensure a fair comparison of the two overall lump sum prices” as between the McCourt price (which excluded it) and the Roads price (which had included it).

Much later, there was evidently a mediation, the details of which I excluded from evidence and from which I draw no inference.

 This seemed ironic, since the new analysis would save the Commonwealth about $230,000 off XL’s original claim. The Commonwealth’s objection was based on late disclosure, - but the unhappy fact is that McCourt did not finally complete the project and all punchlist items until April or May of 2012, and we tried the case in September.

To compensate for the fact that an 840-day extension would place the completion date well into the winter season, the actual recommendation was for a 944-day extension.

XL’s position is actually that the delay chargeable to utility relocation work is 754 days, not 840 days. The difference is that the 840-day calculation began at the December 13, 2004 Notice to Proceed, while the 754-day calculation starts at March 8, 2005, the date shown on Roads’ baseline schedule for completion of the utility relocation.

The five-day difference would affect only Stevens’s calculation of “extended general conditions,” and that to the extent of about $4,000.

Stevens testified with the aid of PowerPoint slides, which were displayed during his testimony and a copy of which was marked as Exhibit H for identification. I viewed the slides at the time and have referred to Exhibit H for certain details (for example, exact rather than rounded figures) that were presented visually at trial but do not come through in the transcript.

Kevin Gill testified that in one or more meetings with MassHighway concerning XL’s claim, Joseph D’Angelo requested that XL analyze the claim using historical cost data; specifically, *168 MassHighway’s own database of bids submitted on MassH-ighway projects. D’Angelo did not recall making the request, testifying instead that MassHighway’s concern was whether there was an entitlement to compensation for delay, and that the discussions never got past this to the subject of what the amount of compensation ought to be. I credit Gill’s recollection and find that MassHighway suggested that if it were ever determined that a monetary adjustment for delay was in order, the cost escalation factor should be calculated using MassHighway’s historical pricing data. This is what Stevens did.

Stevens contacted MassDOT to determine whether the date ranges could be more closely adjusted to fit the delay on the Winter Street project, but never received a response.

Stevens was interested in this range because McCourt would be using 3600 cubic meters of this item on the Winter Street project.

These are not actual per diem costs for Roads and Bridges respectively; they are the total dollars for each divided by the full 838 days during which Roads first, then Bridges, was on the job. It works arithmetically, even if the nomenclature is confusing.

Of note is the fact that these were costs of administering this project only; they were not home office or “Eichleay” costs in which general overhead is allocated “among all contracts based upon the percentage the dollar volume of any one contract bears to the dollar volume of all contracts over the same period,” as in PDM Plumbing & Heating, Inc. v. Findlen, 13 Mass.App.Ct. 950, 950 (rescript opinion; citing to Eichleay Corp., 60-2 B.C.A. par. 2688 (CCH I960)).

 Carrara’s direct claim to MassHighway dated May 2, 2011, six weeks after the last of the bulb tees were delivered to the site, was in the amount of $283,093, and was well documented. I do not know why both Gill’s and Stevens’s figures are slightly higher, unless it is because they included interest. I accept the $283,093 figure as the correct principal amount of Carrara’s claim.

Of course, even this bit of corroboration is an imperfect comparison: national prices may have increased at a greater or a lesser rate than Massachusetts prices. As awkward as MassDOTs estimator tool maybe for these purposes, it has the cardinal virtue of focusing on Massachusetts bid prices for public works road and bridge projects—in other words, on the relevant data pool. It appears that construction prices rose somewhat higher in Massachusetts than nationally, which might be explicable by the comparatively better health of the Massachusetts economy, especially in the housing sector, during this period.

This is not to say that McCourt’s price was unreasonable or above-market. Roads failed; McCourt—whose 2007 bid was the lowest of four—lives on.

“No adjustment shall be made if the performance by the Contractor would have been prevented by other causes even if the work had not been so suspended, delayed or interrupted by the Department.”

Ihis was made even more explicit, elsewhere in the contract, with respect to the drilled shafts—the poured foundation elements on which the two bridge abutments and three piers were to rest, and thus a very early item of critical path work. Ex. 1A, p. 007816-28, §945.51 (‘The Contractor shall submit an installation plan for review and approval of the Engineer at least 30 days prior to the anticipated date of beginning drilled shaft work”).

Ultimately, for the reasons explained below, I agree with XL’s position that in this case, MassHighway’s conduct was such as to relieve XL of the contractual limitations on delay damages, permitting recovery of its actual damages. Because this is an unusual finding in an unusual case, however, and because it seems clear that—irrespective of the holding on this or any other issue—this case is likely headed for appellate review, I have thought it best that the findings and my analysis of them should cover both the contractual and extra-contractual theories of recovery. As they say in the construction trades, “Measure twice; cut once.”

These are: Reynolds Bros., 412 Mass, at 7; SkopekBros., Inc. v. WebsterHous. Auth., 11 Mass.App.Ct. 947, 947 (1981); and Glynn v. Gloucester, 9 Mass.App.Ct. 454, 461 (1980).

The same was true of all other utilities. As may be discerned in Appendix A, there was no period after July 20, 2005 when the work was stalled solely due to the lack of a force account agreement for the next-in-line utility work.

A11 of the cases XL cites from other jurisdictions, imposing liability on an owner or general contractor for delays caused by its failure to coordinate and/or motivate others on the job, are distinguishable in one critical respect: none involved a contract that precluded recovery for delays resulting from the cause there at issue; one, in fact, expressly permitted such a claim. S. Leo Harmonay, Inc. v. Binks Mfg. Co., 597 F.Sup. 1014, 1027-28 (S.D.N.Y. 1984) (general contractor liable to subcontractor for delays caused by another sub); John A. Johnson and Sons, Inc. v. United States, 180 Ct.Cl. 969 (1967) (government liable for delay caused by fellow contractor); L.L. Hall Constr. Co. v. United States, 177 Ct.Cl. 870 (1966) (same); Housing Auth. of Little Rock v. Forcum-Larmon, Inc., 248 Ark. 750, 454 S.W.2d 101 (1970) (delay caused by utility work); Grant Construction Co. v. Bums, 92 Idaho 408, 410, 443P.2d 1005, 1007 (1968) (delay caused by utility work; contract expressly permitted claims for delay “as a result of utility facilities not being removed or relocated”); Commonwealth, Dept, of Highways v. S.J. Groves & Sons Co., 20 Pa.Cmwlth. 526, 343 A.2d 72 (1975) (utility work).

MassDOT has also observed that a delay claim under G.L.c. 30, §390 must be “for fifteen days or more” to be compensable; therefore, it concludes, there is no claim at all. Because, for reasons explained below, the compensable delay period exceeds fifteen days and section 390 relief is not available to XL in any event, the observation is irrelevant.

I do not accept MassDOTs argument that by submitting a claim for equitable adjustment, XL waived its claims for relief outside the contract. To ignore the contractual claims procedure would be to risk losing all claims, within or outside the contract. See Glynn v. Gloucester, 21 Mass.App.Ct. 390, 397-98 (1986). In any event, never having given XL an up-or-down response to its claim, MassDOT seems in a poor position to argue waiver.

This concise description is borrowed firom Ted’s Master Serv., Inc. v. Farina Bros. Co., 343 Mass. 307, 308 (1961).

In Acme Plastering Co. v. Boston Hous. Auth., 21 Mass.App.Ct. 669,672 n.3 (1986), the Appeals Court affirmed in relevant part the decision of a trial judge who, citing Farina Bros., had ruled that the contractor had substantially performed where “the BHA’s conduct was arbitrary and capricious and unreasonably hindered Acme in completing its work.” Acme Plastering remains the only appellate decision that has relied on the Farina Bros, holding to provide a contractor with relief of any kind.

The exception would be the “extended general conditions” claim, which is directly related to MassHighway’s insistence that XL keep a crew on site.

As support for its claim for incidental damages, Carrara’s counsel referenced sections 2-703(e) and 2-710 of the Uniform Commercial Code, which provide for incidental damages in the case of a buyer’s default. (Ex. 101.)